[Nos. 38592, 38629.    En Banc.    March 6, 1969.]

THE STATE OF WASHINGTON, *Respondent*, v. ARTHUR
NATHANIEL AIKEN, *Appellant*.
THE STATE OF WASHINGTON, *Respondent*, v. ANTONIO
NATHANIEL WHEAT, *Appellant*.*

*Reported in 452 P.2d 232.

*Robert S. Egger* and *Kempton, Savage & Gossard,* by *Anthony Savage, Jr.,* for appellant Aiken (appointed counsel for appeal).

*Charles M. Stokes* and *Philip L. Burton,* for appellant Wheat (appointed counsel for appeal).

*Charles O. Carroll* and *William L. Kinzel,* for respondent.

HAMILTON, J.—The defendants, Arthur Nathaniel Aiken and Antonio Nathaniel Wheat, were jointly charged by amended information with three separate and distinct counts of murder in the first degree, allegedly committed with a premeditated design to effect death or while the defendants were jointly engaged in committing, attempting to commit, or withdrawing from the scene of a robbery. Appropriate pleas of not guilty were entered. Motions for separate trials were interposed by the respective defendants and denied. Trial was duly held before a jury, which returned separate verdicts of guilty as to each defendant and as to each count. The respective verdicts were accompanied in each instance by the jury's recommendation, in answer to a special interrogatory as to each count, that the death penalty be imposed. Judgment and sentence as to each defendant and each count was entered upon the verdicts and timely notices of appeal were given.

This court affirmed the convictions by opinion in *State v. Aiken,* 72 Wn.2d 306, 434 P.2d 10 (1967). Defendants thereafter petitioned the United States Supreme Court for review by way of certiorari. The United States Supreme Court, on June 17, 1968, granted the respective petitions, vacated the judgments of this court, and remanded the case for further consideration by this court in the light

of *Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 Sup. Ct. 1620 (decided May 20, 1968) and *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 Sup. Ct. 1770 (decided June 3, 1968). *See Wheat v. Washington,* 392 U.S. 652, 20 L. Ed. 2d 1357, 88 Sup. Ct. 2302 (decided June 17, 1968).

This court called for briefs from counsel for the defendants upon the issues raised by the remand, and set the causes down for supplementary oral argument on September 23, 1968.

In approaching the issues raised by the remand, we consider first the impact of *Witherspoon v. Illinois, supra,* and secondly the applicability of *Bruton v. United States, supra,* as such relate to the trial of the defendants, and the results of that trial. The circumstances surrounding the crimes of which defendants were convicted are set forth in detail in our former opinion. We will allude herein only to such facts as are necessary to an understanding of our rulings.

In *Witherspoon v. Illinois, supra,* the United States Supreme Court had before it a case wherein an Illinois jury had found a defendant guilty of murder and imposed the penalty of death. The jury had been selected from a panel of veniremen from which had been excluded on voir dire examination some 47 prospective jurors who expressed in varying degrees opposition to capital punishment. Only 5 of the 47 veniremen stated that under no circumstances would they vote to impose the death penalty. The remaining 42 either did not so state or were not asked, and were accordingly excused upon the broad base of their expressed though varying reservations about capital punishment. Holding that the jury selected from the remainder of the panel of veniremen did not, upon the issue of penalty, represent an impartial jury, within the contemplation of the sixth and fourteenth amendments to the United States Constitution, the United States Supreme Court sustained the conviction but set aside the penalty verdict. In so doing the court stated, at 520.

If the State had excluded only those prospective jurors who stated in advance of trial that they would not even

consider returning a verdict of death, it could argue that the resulting jury was simply "neutral" with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. . . .

. . . Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

The court further amplified its holding in footnote 21 of the opinion, wherein it observed, at 522:

[N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*. Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction*, as opposed to the *sentence*, in this or any other case.

Our inquiry, then, if we are to determine the effect of the *Witherspoon* doctrine upon the instant case, must be directed to the basis upon which certain members of the panel of prospective jurors drawn for the trial were excused for cause.

In this state, first degree murder, including felony murder, is punishable by life imprisonment, unless the jury finds, by special verdict, that the punishment shall be death. RCW 9.48.030.[1] Thus, a jury in a first degree murder trial

---

[1] "Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless the jury shall find that the punishment shall be death; and in every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict

may be called upon to make two determinations, (1) the determination of guilt or innocence, and (2) the determination of penalty if the first finding is one of guilt. On the voir dire examination of prospective jurors, our pertinent statutes provide with respect to challenges for cause:

> Challenges for cause shall be allowed for such cause as the court may, in its discretion, deem sufficient, having reference to the causes of challenge prescribed in civil cases, as far as they may be applicable, and to the substantial rights of the defendant. RCW 10.49.040.

> No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense. RCW 10.49.050.

These statutes were first enacted in the Code of 1881, and became a part of the law of this state at a time when the penalty for first degree murder was death, subject only to pardon or commutation by the Governor. Code of 1881, § 786; Laws of 1891, ch. 69, § 1. Since that time, this state first abolished the death penalty and substituted life imprisonment (Laws of 1913, ch. 167, § 1), and then reinstated it subject to imposition by special verdict of the jury (Laws of 1919, ch. 112, § 1, now codified as RCW 9.48.030). Neither RCW 10.49.040 or 10.49.050, above referred to, have been significantly amended since their original enactment.

Against this statutory history and background, we have consistently held that a prospective juror who, on voir dire examination, revealed a conviction concerning the death penalty which would prohibit and preclude him from either making a finding of guilt in a capital case or imposing a death penalty under any circumstances was subject to challenge for cause pursuant to RCW 10.49.050 or by virtue of the general rule reflected in RCW 10.49.040. *State v. Riley,* 126 Wash. 256, 218 Pac. 238 (1923); *State v. Leuch,* 198 Wash. 331, 88 P.2d 440 (1939); *State v. Smith,* 74 Wn.2d 744, 446

---

as to whether or not the death penalty shall be inflicted; and if such special verdict is in the affirmative, the penalty shall be death, otherwise, it shall be as herein provided. . . ." RCW 9.48.030.

P.2d 571 (1968). Thus, we have heretofore interpreted and applied the pertinent challenges for cause statutes in complete harmony with the *Witherspoon* doctrine.

In the instant matter, 94 prospective jurors were called and questioned on voir dire before a jury of 12 and one alternate was finally made up. During the course of the voir dire examination 25 veniremen expressed reservations about imposing the death penalty. Of these 25, 19 were excused for cause from serving upon the jury by virtue of their views with respect to capital punishment. The remaining six were either excused for other reasons or because of peremptory challenge.

Throughout the voir dire examination of the jurors called to the jury box, and in the presence of prospective jurors seated in the courtroom, the trial judge by his questions and rulings and trial counsel by their interrogation repeatedly made it abundantly clear to the veniremen that (a) the defendants were charged with murder in the first degree; (b) the jury would be called upon to determine guilt or innocence and, upon a finding of guilt, to determine penalty; (c) the death penalty was not mandatory, but could only be imposed as a result of an affirmative answer by the jury to a special interrogatory; (d) life imprisonment sentences on separate counts could be made to run consecutively; and (e) a prospective juror who held convictions regarding the death penalty which would prohibit that juror from imposing such a penalty under any circumstances would be excused for cause, but that one who, despite his or her reservations, could vote for such a penalty if circumstances warranted would not be so excused.

Somewhat typical of the preliminary question asked virtually every prospective juror by the trial judge, as a prelude to voir dire examination by respective counsel, is the following:

> Then I would ask you that if you sat as a juror in this case, and the twelve jurors decided that either one or both of the defendants were guilty, as charged, of first degree murder, and then you came to consider the question there that you would have to answer, "Shall the death

penalty be inflicted?" Would you have an open mind on that question and determine whether it shall be life imprisonment or death, and if you felt that the facts warranted it, could you vote to impose the death penalty?

Of the 19 veniremen excused for cause by reason of their reservations regarding capital punishment, defendants point only to 6[2] who they contend either gave equivocal answers to the trial judge's questions or who were not directly asked the crucial question. We set forth, by footnote, the pertinent voir dire examination of each of the six veniremen in question.[3] Excusal of the remaining 13 veniremen is not directly questioned by defendants; however, by footnote and for purposes of illustrating the scope, tenor, and general context of the over-all voir dire examination, we set forth the significant portions of their examinations.[4] Likewise, and for purposes of comparison, we set forth parts of the voir dire of the 6 jurors—out of the 25—who, though expressing reservations about capital punishment, were excused for other reasons or challenged peremptorily.[5]

It would appear, from their answers on voir dire examination, that the 13 veniremen referred to in footnote 4 clearly entertained totally preclusive convictions regarding imposition of the death penalty. Their responses to the critical questions were direct, certain, and definite. Their mode of expression was such as to foreclose any question concerning their position, that being that they would automatically vote against the death penalty under any and all circumstances. They were properly excused within the orbit of the *Witherspoon* doctrine, as well as the thrust of our own decisions.

◼ Of the 6 veniremen to which defendants have directed our attention, 3 gave what clearly amounted to definitive answers to the crucial questions, despite the fact that their responses were not stated as positively and as

---

[2] Nancy P. Frewaldt, Arthur M. Murayama, Robert D. Risvold, Marilyn J. Bomgren, Agnes G. Comer, and W. W. Painter.

[3] See Appendix I.

[4] See Appendix II.

[5] See Appendix III.

forcefully as the 13 veniremen just alluded to. Not every lay person, or personality, in the unfamiliar atmosphere of a court room, is given to readily expressing deep-seated opinions or views cogently and emphatically. Nevertheless, the conscience and convictions of the meek or modest can and usually do run as deep and unwavering as those of the person inclined to robust expression. We are satisfied *Witherspoon* does not demand nor compel a formulistic dialogue on voir dire examination in order to establish that a prospective juror maintains views which preclude him from imposing capital punishment under any circumstances. It is sufficient, we believe, if a venireman communicates his views in such a fashion as to clearly convince the trial judge that his opinion in opposition to the death penalty is honest, unyielding, and irrevocable. We are satisfied that prospective jurors Nancy P. Frewaldt, Arthur M. Murayama, and Robert D. Risvold met this test.

Before turning to the remaining three of the six veniremen pointed to by defendants, namely, Marilyn J. Bomgren, Agnes G. Comer, and W. W. Painter (see footnote 3), we pause to observe that our appellate review is limited to the written statement of facts, whereas the trial judge had the veniremen before him in person and could readily observe and note their attitude, deportment, tone of voice, and facial expressions during voir dire examination. Furthermore, in the instant case, the trial judge was one with many years of experience as a lawyer and jurist.[6] His learning and wisdom in the field of criminal law generally, as well as his familiarity with our decisional law, is amply demonstrated by his conscientious and meticulous preliminary examination of virtually every one of the prospective jurors.

Veniremen Bomgren, Comer, and Painter were, respectively, the 26th, 33d and 72d members of the jury panel called to the jury box for voir dire examination. Each had

[6]The trial judge, Honorable William J. Wilkins, has served in that capacity since December 17, 1939. In addition to such service, and in recognition of his ability, Judge Wilkins was selected and served as one of the judges at the Nurnberg War Crimes Trial following World War II.

been in the courtroom for at least a full day and heard and observed the voir dire examination of from 24 to 32 preceding veniremen. Each had heard the voir dire questions concerning capital punishment repeated with almost monotonous regularity and each had the opportunity of noting the responses and rulings with respect thereto. In this context it would be wholly unrealistic to assume that each did not understand what part their convictions with respect to the death penalty would play in their possible selection as jurors, and it would be equally unreasonable to presume that the learned trial judge misinterpreted their responses or the depth of their convictions when they were before him and he was questioning them. Particularly would this latter observation appear to be so with respect to Venireman Painter, with whom, the record reveals, the trial judge was personally acquainted. Though it may be conceded that the voir dire testimony of these three veniremen could, from the standpoint of appellate review, have been more complete and definitive, we are convinced from the voir dire testimony of the panel as a whole that the trial judge did not violate the spirit of *Witherspoon* in excusing them on the basis of their statements and his evaluation of them.

In our considered judgment, the total record of the voir dire examination of the prospective jurors in this case utterly belies any systematic, indiscriminate exclusion of veniremen for cause simply because they voiced general objections to capital punishment.

We accordingly conclude, on this phase of the case, that the selection of the jury was carried out in full accord with the teachings of *Witherspoon*.

In *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 Sup. Ct. 1620 (1968), the United States Supreme Court was confronted with a joint-trial situation wherein one of the defendants, Evans, had made a pretrial incriminating statement and the other defendant, Bruton, had not. The pretrial statement implicated both defendants and was admitted into evidence during the course of the trial

which resulted in a conviction of both defendants. At appropriate times, during the trial, the trial judge cautioned and instructed the jury that the statement could only be considered as against the declarant, Evans, and not his codefendant Bruton. On appeal, the conviction of Evans was set aside on the grounds that the statement was involuntary and should not have been admitted in evidence. The appellate court, however, affirmed Bruton's conviction. In review, by way of certiorari, the United States Supreme Court reversed Bruton's conviction, at 126,

> because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.

In reaching its result, the court overruled *Delli Paoli v. United States,* 352 U.S. 232, 1 L. Ed. 2d 278, 77 Sup. Ct. 294 (1957), wherein the court, acknowledging that an extrajudicial statement of one codefendant was inadmissible hearsay against another codefendant, went on to hold that a jury could be relied upon to follow limiting instructions cautioning against use of the statement as evidence against the nondeclarant. In overruling *Delli Paoli,* the court relied in part on *Jackson v. Denno,* 378 U.S. 368, 12 L. Ed. 2d 908, 84 Sup. Ct. 1774 (1964), and *Douglas v. Alabama,* 380 U.S. 415, 13 L. Ed. 2d 934, 85 Sup. Ct. 1074 (1965), pointing out the theory that juries would invariably follow limiting instructions had been repudiated in some instances. In *Bruton* the court expressed its rationale, at 135:

> Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. "A defendant is entitled to a fair trial but not a perfect one." . . . It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, as was recognized in *Jackson v. Denno, supra* [378 U.S. 368, 12 L. Ed. 2d

908, 84 Sup. Ct. 1774 (1963)], there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. . . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. (Footnote omitted.)

Two observations should be made. First, in both *Douglas v. Alabama, supra,* and *Bruton,* the substantive content of the codefendant's admissions was crucial to the prosecution's case against the nondeclarant. In *Douglas* it was the "only direct evidence" (at 419) of the nondeclarant's participation in the crime. In *Bruton,* it added "substantial, perhaps even critical, weight" (at 128) to the prosecution's case. Second, in both cases, and in *Roberts v. Russell,* 392 U.S. 293, 20 L. Ed. 2d 1100, 88 Sup. Ct. 1921 (1968), the extrajudicial admissions of only one of the accused persons was put before the jury.

In the instant case, both defendants made detailed extrajudicial admissions and all statements made were admitted into evidence. With respect to the Owen Fair and Daniel Wolf murders, each defendant's statement was by itself a confession to direct, personal, and active participation in a brutal, cold-blooded, felony murder. Each defendant's statements concerning these two murders established such defendant as a principal, and chargeable, as such, in each murder under the provisions of RCW 9.01.030, which provides:

Every person concerned in the commission of a felony, gross misdemeanor or misdemeanor, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who directly or indirectly counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor, is a principal, and shall be proceeded against and punished as such.

With respect to the Owen Fair murder, defendant Wheat by his pretrial statement[7] admitted (a) ownership of a 1954 Ford automobile, license No. BCK 090, (b) his presence in the automobile with defendant Aiken at the service station when and where the Fair robbery and murder took place, (c) his direct participation in the robbery by opening and searching the station's cash box while defendant Aiken held the attendant at gun point in the lube room, (d) observing defendant Aiken taking money from the attendant's person, (e) leaving the immediate scene to start the automobile, (d) hearing the shots, (f) waiting for defendant Aiken, (g) sharing in the proceeds of the robbery, and (h) driving away with defendant Aiken.

Defendant Aiken, by his pretrial statement[8] concerning the same murder, admitted (a) his presence with defendant Wheat in Wheat's automobile at the time and place of the robbery and murder, (b) his ownership of the .22 caliber pistol identified as the death weapon, (c) holding the attendant at gun point in the lube room while defendant Wheat opened and searched the station's cash box, (d) observing money being taken from the person of the attendant, (e) subduing the attendant with ether, (f) handing the gun to defendant Wheat and observing him shoot the attendant at least four times, (g) departing the scene with defendant Wheat in Wheat's automobile, and (h) sharing in the proceeds.

Similarly, in connection with the Daniel Wolf murder, defendant Wheat, by his pretrial statement,[9] acknowledged

[7]See Appendix IV.
[8]See Appendix V.
[9]See Appendix VI.

his presence (a) in his automobile with defendant Aiken at the service station involved on the date and at the time concerned, (b) in the service station office with the attendant and defendant Aiken when the attendant was held at gun point while money from the cash box and floor safe was removed, (c) in the lube room, to which the attendant had been taken at gun point and where the attendant was shot while praying, and (d) in the automobile where the money from the robbery was divided.

Defendant Aiken, too, by his pretrial statement[10] concerning the Wolf homicide, avowed his (a) presence with defendant Wheat at the service station involved, (b) threatening the attendant with his .22 caliber pistol, (c) participation in taking money from the station's cash box and floor safe, (d) presence in the lube room when and where the attendant was shot while in the act of praying, (e) departure with defendant Wheat in Wheat's automobile, and (f) sharing in the proceeds of the robbery.

Even in summary, it is readily apparent that each defendant, by his individual pretrial statements, independently acknowledged a knowing and willing participation in the events leading up to and culminating in the Fair and Wolf homicides. Both defendants individually agree that the two robberies and murders took place, for the most part, in their joint presence, and disagree only as to which defendant performed certain acts, *i.e.*, the actual killing of the victims. Such being the case, the jury had no reason to look beyond each defendant's individual statements to reach a conclusion of individual complicity and culpability. In short, a determination of either defendant's guilt did not turn or even hinge upon the incriminating statements of his codefendant. Confrontation and cross-examination of either defendant by the other at a separate trial, with the intervention of the Fifth Amendment privilege, would have added nothing and subtracted little from the individually acknowledged fact that each robbery and murder constituted a joint enterprise, feloniously, willfully, voluntarily, and without hesitancy or remorse, engaged in by each defendant.

[10]See Appendix VII.

Furthermore, during the voir dire examination, throughout the trial, in the formal instructions to the jury, and by the very verdict forms and special interrogatories, it was cogently and consistently emphasized to the jurors that they were to determine the culpability of each defendant as to each count separate and apart from the other. And, upwards of 12 times during the course of the trial, as well as in the formal instructions to the jury, the learned trial judge aptly and forcefully admonished the jurors that they could not consider the pretrial statements of one defendant as evidence against the other defendant.

In this context, and against the background of these circumstances, we are convinced the risk is infinitesimal, if not nonexistent, that the jurors ignored, disregarded, or could not follow the cautionary and limiting admonishments and looked to the incriminating statements of one codefendant to aid them in determining the culpability of the other.

We hold, therefore, that the joint trial of the defendants as to the Fair and Wolf murders did not deny them a fair trial or violate their rights under the Confrontation Clause of the Sixth Amendment within the contemplation of *Bruton*. Cf. *People v. DeVine,* 57 Misc. 2d 862, 293 N.Y.S.2d 691 (1968).

We turn, then, to the third count of the information charging defendants jointly with the felony murder of James Harp. At the outset, in considering the impact of *Bruton* upon the joint trial of the defendants with respect to this killing, we pause to observe that the circumstances surrounding this robbery and murder—the automobile, the timing, the modus operandi, the gun, the physical evidence upon the scene (spent cartridges from defendant Aiken's .22 caliber pistol), the callousness of the slaying—readily lend themselves to a conclusion that this was but the third in a series of robberies and murders jointly conceived and executed by the defendants pursuant to a common plan and design. And, it is entirely logical and reasonable that a jury could have so found in the light of the defendants' individual complicity in the Fair and Wolf murders, coupled

with the corroborative circumstantial evidence bearing on the Harp homicide, without having before it pretrial statements of the respective defendants concerning this offense.

Nevertheless, the fact remains that the defendants made certain statements concerning the actual participation of each in this robbery and murder, all of which were introduced into evidence and presented to the jury for its consideration and evaluation.

Defendant Wheat made three statements concerning this, the Harp murder. In his first statement[11] he acknowledged his presence in the car, accused defendant Aiken of perpetrating the robbery and murder, and denied that he, Wheat, participated. In his second statement[12] Wheat admitted his voluntary participation in the events, but accused defendant Aiken of being the major actor. In a third statement[13] Wheat asserted that defendant Aiken was asleep in the car, and claimed that he, Wheat, was the sole actor.

Defendant Aiken made only one extrajudicial statement[14] concerning this crime. In this statement he insisted that he was asleep in Wheat's car during all times relevant to this offense.

It is at once apparent that defendant Wheat's statements separately, independently, and irrevocably catalogue him as a principal in the commission of the Harp felony murder. These statements, coupled with his admitted complicity in the Fair and Wolf homicides, together with the corpus delicti, are alone sufficient to establish his guilt. As with the Fair and Wolf murders, neither the prosecution nor the jurors were required to seek corroboration of his culpability from extrajudicial statements of his codefendant Aiken, and the risk that the jurors ignored appropriate limiting instructions in this respect is nominal and puerile.

We are satisfied, therefore, that, so far as defendant Wheat be concerned, his rights under the Confrontation Clause of the Sixth Amendment, as contemplated by *Bruton*,

---

[11]See Appendix VIII.

[12]See Appendix IX.

[13]See Appendix X.

[14]See Appendix XI.

were not violated by his joint trial with defendant Aiken upon the Harp murder count.

Abstractly speaking, the same cannot be said with respect to defendant Aiken for, if the jury accepted as true defendant Wheat's third statement and defendant Aiken's only statement concerning the Harp killing, it conceivably could have determined that defendant Wheat was the sole perpetrator and that defendant Aiken did not aid or abet him in the commission thereof. In reaching such a result, however, the jury would have been compelled to ignore the trial court's limiting instructions relative to the use of a codefendant's out-of-court statement in determining the guilt or innocence of the other codefendant.

On the other hand, if one presumes that the jury, in finding defendant Aiken guilty of the Harp murder, disregarded entirely all of the circumstantial evidence bearing upon his knowledgeable complicity in a mutual and continuing series of robbery-murders, and gave some credence to his statement with respect to his somnolent state at the time of the Harp slaying, it is possible to hypothesize that the jury looked to defendant Wheat's first two extrajudicial statements incriminating Aiken in reaching its determination of Aiken's guilt.

Under all of the circumstances revealed by the evidence, we do not consider the latter hypothesis any more reasonable or logical than the first abstraction. As we have heretofore pointed out, the circumstantial evidence of defendant Aiken's deliberate complicity and participation in a common plan and design is such as would fully warrant and support a finding of guilt on this count without reference to the extrajudicial statements of either defendant concerning the event; and the mere fact that such statements were offered and admitted into evidence, coupled with a finding of guilt, does not ipso facto import a substantial risk that the jury objectively or subjectively disregarded and ignored the trial judge's careful and painstaking limiting admonitions and instructions. To so hold would impute an undeserved lack of conscience and in-

tegrity to a jury composed of sincere, law abiding, and conscientious citizens charged with the responsibility of passing upon the gravest of questions which can be submitted to a jury under our system of justice. In our view, such an imputation, with its inevitable side effects upon the effective administration of justice in cases involving deliberate joint criminal enterprises, should not be casually or indiscriminately inferred, for to do so tends to artificially elevate the rights of a criminal defendant above those of his victims as well as the interests of society in penalizing those who would band together in transcending the law. We do not believe the reach of *Bruton*, either fact-wise or in theory, extends that far.

We accordingly conclude that defendant Aiken's rights under the Confrontation Clause of the Sixth Amendment, as contemplated by *Bruton*, were not breached in any substantial or prejudicial degree with respect to the Harp slaying.

To summarize: The guidelines laid down in *Witherspoon* were not transgressed in the selection of the jury for this trial. Therefore, the penalties imposed by the jury stand if the convictions stand. And, we find no breach of the rights of either defendant under the Confrontation Clause of the Sixth Amendment, as enunciated and applied in *Bruton*, by virtue of the joint trial as to any one of the three murder counts.

Accordingly, the convictions and the penalties as to each count are affirmed.

ALL CONCUR.

APPENDIX I.

*Nancy P. Frewaldt.*

"BY THE COURT: Q. Let me ask you, because Counsel may want to ask you some other questions, in the event that you, as a member of the jury of twelve, decide that either one or both of the defendants are guilty as charged of murder in the first degree, I will submit to you an interrogatory which will read as follows: 'Shall the death penalty be inflicted,' to which you must answer a question, 'Yes,' or 'No,' so that you have the choice that Mr. Stokes [Counsel for defend-

ant Wheat] mentioned, either to vote for the death penalty or for life imprisonment.

"Now, in the event that you felt that the evidence warranted it, are you so constituted that you could bring yourself to vote for the death penalty? A. I don't know if I could or not. Q. Well, you know your own mind. A. I don't think I could. Q. You don't think that you could? . . . By Mr. Savage [Counsel for defendant Aiken]: Q. Mrs. Frewaldt, your present state of mind is that you don't believe that you could vote for the imposition of the death penalty, is that correct? A. No, I don't think that I could."

*Arthur M. Murayama.*

"By the Court: Q. I think I did put the question, Mr. Murayama, to you as one of the group, you recall, as to whether or not you were opposed to the death penalty? You answered no? A. The answer was no. . . . A. Thinking about it more, I am opposed to it because of my religion. Q. (By The Court) You feel that you are sitting as a juror, and as a member of this jury, and the twelve jurors found the defendants guilty as charged, and then you had to answer the special question, or interrogatory, 'Shall the death penalty be inflicted?' You feel that because of your religion you could not bring yourself to vote for the death penalty, even though you felt the evidence might warrant it? A. Yes, sir."

*Robert D. Risvold.*

"By the Court: Q. Mr. Risvold, is that the way you pronounce it? A. Risvold. Q. Risvold. You were sitting here yesterday also? A. Yes, sir. Q. And you have heard the proceedings thus far? A. Yes, sir. Q. Are you opposed to capital punishment? A. I have reservations about it. Q. Well, I will put it to you specifically then; let us assume that you are sitting as a member of this jury and the jury finds the defendants guilty as charged, then the jury has the added burden of deciding what the penalty shall be; the choice being, well, the interrogatory that is submitted is, 'Shall the death penalty be inflicted?' If you answer Yes, it means that my order will so direct. If you answer No, then I would sign an order that it would be life imprisonment. That is the difference. The jury makes the decision based upon the evidence.

"Now, if the evidence were such that you were convinced that it called for the death penalty, could you bring yourself to vote for it? A. I don't believe I could, sir."

*Marilyn J. Bomgren.*

"By the Court: . . . . Q. You were here yesterday, Mrs. Bomgren. You know what the nature of this case is? A. I do. Q. You have heard the various questions put to the jurors by the different lawyers and myself? A. Yes. Q. Are you opposed to capital punishment? A. Yes."

*Agnes G. Comer.*

"By the Court: . . . . Q. Mrs. Comer, you have been sitting here throughout the day yesterday? A. Yes, sir. Q. You understand what

the charges are in this case? A. Yes, sir. Q. Are you opposed to the death penalty? A. Yes, I am."

*W. W. Painter.*

"By the Court: Q. Well, Mr. Painter, you and I know each other quite well from our association in the Bridle Trails Park area, and the fact that our children ride horses, and so on? A. Yes, sir. Q. You live over close to that area. And I wanted to ask you, you have been sitting here—I noticed yesterday—are you opposed to the death penalty? A. Basically, yes, sir. Q. Then let me put this to you: If you are sitting as a member of this jury, and you are satisfied at the conclusion of all of the evidence that the Prosecution has proved the guilt of these defendants beyond a reasonable doubt, they are guilty of murder in the first degree, could you so vote? A. It would be difficult, your Honor. Q. Maybe you didn't understand my question. I will state it again.

"If you are sitting as a member of the jury, and at the conclusion of all of the evidence, the jury is convinced of the guilt of these defendants as charged—that is, murder in the first degree—could you vote for such a verdict? A. I can vote, yes. Q. Beg your pardon? A. I could vote, yes, sir. It would be difficult for me to vote in favor of the death penalty. Q. Yes, I understood. Now, I am coming to that. So in the event that you did, as a member of the jury, find the defendants guilty of murder in the first degree, you then come to this additional duty that the jury has only in first degree murder cases. They must set the penalty, and so you are required to answer the interrogatory, 'Shall the death penalty be inflicted?', and I understand from you that no matter what the evidence may be, nothing could persuade you to vote for the death penalty? A. I wouldn't say nothing, but I think it would take an extremely strong case. Q. Strong case? Well, then I will ask you, if the circumstances, the evidence is such that you feel that the death penalty is warranted, could you bring yourself to vote for it? A. Yes, sir. . . . By Mr. Kinzel [Deputy Prosecuting Attorney]: . . . Q. Now, you indicated some reservation here about the death penalty, that you were opposed to it? A. Basically, I think I am, yes. Q. Of course, it is necessary for us to have open-minded jurors here. Do you think that because of those views that you could conscientiously serve on this jury? A. I don't honestly know. Q. There is some doubt in your mind? A. Yes. Q. Would you prefer not to serve on the jury? A. I think so, yes. . . . By Mr. Savage [Counsel for defendant Aiken]: Q. Mr. Painter, can you imagine a set of circumstances, any set of circumstances, the most extreme set of circumstances under which you would be willing to vote for the death penalty? A. Well, — Q. My question is not would you, but could you, under an extreme set of circumstances? A. I think I could, yes, sir. . . . The Court: . . . I am more interested, Mr. Painter, in what your views may be reflecting capital punishment. We have already indicated to you that in the event that you find the defendants guilty as charged that is a question that you have to reach. The Juror: Yes, sir. Well, I think— The Court: Are you so constituted that you couldn't bring yourself to vote for the death penalty in any

case? THE JUROR: Yes, sir. THE COURT: You are? THE JUROR: I think so, yes."

## APPENDIX II.

### Earl R. Puckett.

"BY THE COURT: . . . . Q. Are you opposed to the death penalty? A. Yes, sir. Q. You are? A. Yes, sir. Q. You could not bring yourself to vote for it in any case? A. I don't believe so, your Honor. Q. Well, if you were sitting as a member of the jury and the jury found the defendants guilty as charged—that is, of first degree murder—then you were given the interrogatory, 'Shall the death penalty be inflicted?', I take it from your answer that you can conceive of no case in which you would vote for the death penalty? Pardon? A. No, I wouldn't."

### Larry Larsen.

"BY THE COURT: Q. Mr. Larsen, you have been sitting here also all day yesterday and last evening and today thus far, and you are aware of the charges that have been filed in this case? You have heard the questions put to the jurors by myself and Counsel.

"I put the question to you, are you opposed to the death penalty? A. Yes, sir, I am. Q. You could not conceive of any case in which you would be willing to vote for the death penalty? A. No, sir."

### Irene E. Gross.

"BY THE COURT: . . . . Q. You have heard the questions put to the other jurors, have you not? A. Yes. Q. Are you opposed to the imposition of the death penalty? A. Yes, sir. Q. You are? A. Yes, sir. Q. you cannot conceive of any case—let's assume that you were sitting as a member of the jury on this case, and you and the other members found the defendants guilty as charged—that is, of first degree murder—and then you were submitted the interrogatory, 'Shall the death penalty be inflicted?', you could answer it in no other way but 'No,' is that correct? A. That is true, sir. Q. No matter what the evidence may be? No matter. . . . BY MR. BURTON [Counsel for defendant Wheat]: Q. Mrs. Gross, do you understand the Court's question to be, can you conceive of a case in which you could give the death penalty? A. No, sir. I could not give a death penalty to anyone, sir."

### Ruby E. Van DeHoven.

"BY THE COURT: . . . Q. You have been sitting here now this afternoon, Mrs. Van DeHoven, and you have heard a statement of the nature of the case; you have heard the questions put to the other jurors, have you not? A. Yes. Q. Are you opposed to the death penalty? A. I am against it. Q. You are against it? A. I am against it. Q. Well, let me put it to you in another way: If you sat as a member of this jury, and at the conclusion of the evidence the jury decided, in which you concurred, of course, that the defendants were guilty as charged of murder in the first degree, then you have an interrogatory that is submitted to you, 'Shall the death penalty be inflicted?', which you

must answer Yes or No. A. I would answer No. Q. In all cases? A. In all cases. Q. You can think of no case in which you think the evidence would warrant you in voting for the death penalty? A. No."

### Grace M. Rohrer.

"By THE COURT: . . . . Q. Mrs. Rohrer, you have been sitting here now this afternoon, and you have heard the statement of the nature of the case, have you not? A. Yes, sir. Q. Have you been able to hear the questions that have been put to the other jurors by myself and by Counsel? A. Yes, sir. Q. I will put the question to you first: Are you opposed to the death penalty? A. Definitely. Q. Against it? A. Yes, sir. Q. Let me ask it a little more specifically. If you were selected as a member of this jury, and the jury came to the conclusion, after hearing all of the evidence, that the defendants were guilty as charged, that is, of first degree murder, and then you are required to answer this special interrogatory, 'Shall the death penalty be inflicted?', I understand from you, no matter what the evidence may be, you could not bring yourself to vote for the death penalty? A. My conscience wouldn't let me."

### Maxine V. King.

"By THE COURT: Q. Is it Mrs. King? A. Yes. Q. Are you opposed to the death penalty? A. Yes, I am. Q. You couldn't bring yourself to vote for it under any circumstances? A. No, I don't believe I could. Q. No matter what the evidence would be? A. No."

### George S. Raymond.

"By THE COURT: Q. Mr. Raymond, I assume that you have been sitting in the courtroom yesterday and today and have heard the questions put to the other jurors and understand the case that is here before us? A. Yes, sir. Q. Are you opposed to the death penalty? A. Yes, sir. Q. If you were sitting as a member of this jury, and you were satisfied from the evidence that the defendants were guilty as charged—that is, of murder in the first degree—could you find them guilty? A. Yes, sir. Q. All right. Then, having found them guilty, sitting as a member of this jury and then reaching the point where you must answer this interrogatory, 'Shall the death penalty be inflicted?', you can conceive of no case under which then that you would render the death penalty? A. No, sir. Q. Regardless of what the evidence may be? A. No, sir, regardless of what the evidence may be."

### Michael Thomas Warren.

"By THE COURT: Q. Mr. Warren, you have been sitting here and have heard the proceedings thus far, yesterday and today? Are you opposed to the death penalty? A. Yes, sir. Q. You are? If you are sitting as a member of the jury, and you are satisfied at the conclusion of all of the evidence that the defendants, or either of them, are guilty as charged, could you find them guilty of murder in the first degree? A. Yes, I could. Q. Then when you come to the additional duty of answering the interrogatory, 'Shall the death penalty be inflicted?',

you could not, under any circumstances, regardless of the evidence, vote for the death penalty? A. No, sir, I could not."

*Joseph A. Bell.*

"BY THE COURT: Q. Mr. Bell, are you opposed to the death penalty? A. Yes, sir, I am. Q. If you are sitting as a member of this jury, and you find under the evidence that the defendants are guilty beyond all reasonable doubt of the crime charged, murder in the first degree, could you render such a verdict? A. Guilty or not guilty? A. Yes. A. Yes, I could, sir. Q. You could. Then, in that event, as you begin then the additional duty of considering what the penalty shall be by answering an interrogatory, 'Shall the death penalty be inflicted?', do I understand that despite the evidence, you could not bring yourself under any circumstance to vote for the death penalty? A. That is correct."

*Kenneth J. Anderson.*

"BY THE COURT: Q. Mr. Anderson, are you opposed to the death penalty? A. Yes, sir. Q. If you are permitted to sit as a juror on this case, and you were satisfied at the conclusion of all of the evidence that the defendants are guilty as charged—that is, of murder in the first degree—could you vote for guilty? A. Yes, I could. Q. Then I understand that when you come to perform the additional duty of deciding, filling out the interrogatory that will be submitted to you, 'Shall the death penalty be inflicted?', you could not, under any circumstances, bring yourself to vote for the death penalty? A. No, sir."

*Arthur E. Alexander.*

"BY THE COURT: Q. Mr. Alexander, are you opposed to the death penalty? A. I would say yes, sir. Q. Pardon? A. Yes, I am opposed to it. Q. Well, if you are sitting as a member of this jury and at the conclusion of all of the evidence you find from the evidence that the defendants are guilty as charged—that is, of murder in the first degree—could you render such a verdict? A. I believe so. Q. Then in that event you would have an additional duty to perform by answering the interrogatory, 'Shall the death penalty be inflicted?'

"Do I understand that in answering that question, you could not bring yourself to vote for the death penalty, regardless of what the evidence may be? A. No, sir."

*Haidee T. Weeks.*

"BY THE COURT: . . . . Q. Mrs. Weeks, are you opposed to the death penalty? A. I am. Q. If you are permitted to sit as a member of the jury in this case, and in the event that the Prosecution satisfied you, as a member of the jury, and the jury, beyond a reasonable doubt of the guilt of these defendants as charged, that is, first degree murder, could you render such a verdict. A. I couldn't render a death penalty. Q. You didn't hear my question. If the Prosecution satisfied you beyond a reasonable doubt, the members of the jury, that the defendants are guilty of the offenses with which they are charged, could you return a verdict of guilty? A. Yes. Q. Then, that having happened, when you began to deliberate what the penalty should be, and you have to answer

the interrogatory, 'Shall the death penalty be inflicted?', I understand from your answer that you can conceive of no case, no matter what the evidence may be, in which you would vote for the death penalty? A. I could not."

*Masao Fujii,* called as a potential alternate.

"BY THE COURT: Q. Mr. Fujii, you have been waiting around here for some time now, and you have heard the questions put to the other jurors, have you not? A. I have, sir. Q. Are you opposed to the death penalty? A. Yes and No. If I have anything to do with it, I don't want it. Q. Well, assuming that you are a member of the jury, and at the conclusion of all the evidence the jury comes to the conclusion that the defendants are guilty as charged, that is, of murder in the first degree, and then you are faced with the responsibility of setting the penalty, and you must answer the interrogatory, 'Shall the death penalty be inflicted?', and your answer must be Yes or No.

"Now, on the basis of the evidence, and your own convictions, are you able to answer the question either Yes or No based upon the evidence? A. I truthfully couldn't say. Q. Well, let me put it another way to you. First, if you are satisfied at the conclusion of all of the evidence that the defendants are guilty of murder in the first degree, are you willing to arrive at such a verdict? A. Yes. Q. Then, having reached that point, and preparing to answer this question, are you so constituted that you could not bring yourself to vote for the death penalty in any case? A. I would hate to put myself in a position where I would have to answer that one. Actually, your Honor, I don't like to be on this particular jury, this case."

APPENDIX III.

*Edward E. Pulver,* excused because of preconceived opinion as to guilt.

"BY THE COURT: Q. I will put one more question to you, Mr. Pulver, before Counsel ask you any questions. You stated that you are opposed to capital punishment? A. Yes, sir. Q. Are you so constituted that you could not bring yourself to vote for the death penalty if you felt the facts warranted it? A. State that again, your Honor. Q. Are you so constituted that you could not bring yourself to vote for the death penalty, even though you felt that the evidence warranted it? A. Oh, I guess I could bring myself to it, but it is just my own opinion, your Honor. Q. Well, you are the one. You know your own mind better than anyone else. Sitting on this jury, in the event that you find either one or both of these men guilty of murder in the first degree, you then have to answer the question, 'Shall the death penalty be inflicted,' and if you felt that the evidence warranted it, could you vote for the death penalty? Just search your own mind and answer it Yes or No. A. Yes, I could."

*William E. Pittman,* passed for cause but later excused peremptorily.

"BY THE COURT: [After the venireman had indicated, in answer to a general question addressed to the 12 jurors first summoned to the jury box, that he had reservations about capital punishment.] Q. The question I want to ask you, are you opposed to the death penalty in any

case? A. I think I could vote for it if the facts warranted it. Q. I will put the specific question to you, then. Assuming after you are in the jury room, and the twelve of you decide that the defendants are guilty as charged, you then have before you an interrogatory that you must answer, 'Shall the death penalty be inflicted?' If you felt that the evidence warranted it, you could bring yourself to vote for the death penalty, is that correct? A. Yes, sir."

*Vaclav Kostrown,* passed for cause but later excused peremptorily.

"By the Court: . . . . Q. Have you been able to understand the proceedings thus far that have taken place since you have been sitting back there? I noticed you were in the very back of the courtroom. Could you hear the proceedings? A. Yes, your Honor. Q. You understand that these two men sitting here are charged with the crime of three counts of murder in the first degree? A. Yes, your Honor. Q. And you heard the questions that were put to the other jurors, did you, by me and by Counsel at the counsel table? A. Yes, your Honor. Q. I will ask you now, and search your own mind because you know the answer to it—are you opposed to the imposition of the death penalty? A. I don't agree with— Q. Pardon? A. I don't agree with the death penalty. Q. You don't agree with it? A. I don't agree, but I will accept this as the law. Q. Well, then I will ask you a little more fully. Supposing that you are selected as one of the members of this jury, and after the evidence is all in, the jury finds these defendants, or any one of them guilty as charged, that is, of murder in the first degree, then you the jury must decide what the penalty shall be. This is the only case in which the jury sets the death penalty, and not the judge; I have nothing to do with that.

. "So, at the conclusion of the evidence, if you find them guilty, then you must answer the question, 'Shall the death penalty be inflicted?', and you must answer that question Yes or No, and you make that decision on the evidence that is before you. Now, if the evidence were such, and you felt that it warranted it, the imposition of the death penalty, could you bring yourself to vote for it? A. Depends on the evidence and the circumstances and on the instructions. Q. All right. Then I gather that if the evidence were of such a nature that you felt it warranted the death penalty, you could vote for it? A. Probably so. Q. Any question in your mind about it? A. I am not quite sure about, if the evidence is clear, there is no reasonable doubt, I will vote for it. . . . Q. . . . . What I am trying to tell you is that if you once reached the decision that they are guilty as charged, then the jury must decide on the penalty. You may either vote for life imprisonment or you may vote for the death penalty; that is the choice that the jury makes, based on the evidence. Do you understand that now? A. I do, your Honor. Q. Then I suppose that on the evidence you could vote for life imprisonment if you felt the evidence warranted it; is that correct? A. Yes, your Honor. Q. And if the evidence warranted the imposition of the death penalty, could you then bring yourself to vote for it? A. I would. Q. All right. That is the test."

· *Cecil H. Tice,* passed for cause and later excused peremptorily.

"By the Court: Q. Mr. Tice, you have been sitting here yesterday, too, have you? A. Yes, I have. Q. Are you opposed to the death penalty? A. Basically, yes. Q. Well, can you conceive of any case in which you would feel warranted in voting for the death penalty? A. Well, I don't really—because of my religious training, I don't feel that the death penalty is ever justified, but since we are subject to the laws and rules of the land, why, I would follow those rules and regulations to the letter. Q. Well, I will put the question specifically to you now. Assuming that you are chosen as a member of this jury, and on the evidence you conclude that the State has proved the guilt of these defendants beyond all reasonable doubt, and you return a verdict of guilty as charged, and if you are convinced from the evidence beyond a reasonable doubt of their guilt, you could bring in a verdict of first degree murder, could you? A. Yes, I could, your Honor. Q. Yes. Now, then, in that event, you will be submitted an interrogatory, as we discussed here. A. Yes. Q. At some length. And it will read specifically, 'Shall the death penalty be inflicted?' In determining that question, if you felt that the evidence warranted it, could you bring yourself to vote for the death penalty? A. I could, your Honor."

*Marian E. Trisler,* excused because of a personal experience.

"By the Court: . . . . Q. Mrs. Trisler, you have been sitting here yesterday and today, have you? A. Yes. Q. You are familiar with the nature of the case that we have here? A. Yes. Q. Are you opposed to the death penalty? A. I am, sir, but may I clarify that? Q. Yes. A. I had a sister that was accidentally shot, and I saw her die, and I could not. Q. It would be distressing for you to sit on a case of this kind? A. Yes, it would. Q. And you would prefer to be excused? A. Yes."

*John J. Wedler,* excused because of a fixed opinion.

"By the Court: Q. Well, Mr. Wedler, are you opposed to the death penalty? A. Yes, with a question. In my opinion, in a case like this, I don't believe that the death penalty is justified in the anguish of whatever went behind all these cases. I don't think it is just. It isn't just enough. I think it is an easy way out, myself. That is my feeling to it. Q. Do you have an open mind at this time about this case? A. No, your Honor. I have an opinion on this. Q. You have a fixed opinion? A. Yes, sir."

## Appendix IV.

Defendant Wheat's statement regarding the Owen Fair murder.

"On a Friday, or Saturday night, near the end of March, 1965, around 10:00 P.M. or 11:00 P.M. I was in Seattle Washington, with my friend, Arthur Aiken. I was driving my 1954 Ford, Washington licence BCK 090, southbound on Empire So., just off of Rainier Ave. So. I drove into a Time Oil station, on the west side of Empire So. I drove in, and parked next to the rest rooms. Aiken and I got out, and went into the mens rest room. We both had a few drink, prior to coming to Seattle, but we were not drunk. As Aiken and I came out of the rest room, a

man drove up in a car. He got out, and opened the door to the station office. Aiken and I, followed the man into the office. The man was wearing a blue-gray mechanics smock. I asked him if I could use the phone, and he said yes. I called my girls house, on the phone located in the station office, near the front door. There was no answer at my girls house, so I hung up. Aiken was standing nearby, and the man had gone out into the lube room, and was doing some work. I tried calling my girls sisters house on the phone, but the line was busy.

"Aiken and I stood around talking for about five minutes, and I tried calling my girls sister again, but the line was still busy. Aiken and I stood around for a few more minutes, and the station man came back into the office. He said that he was getting ready to close up, and if I wanted to make another phone call, I had better hurry up. I tried calling my girls sister again, but the line was still busy. Meanwhile, the station man went back into the lube room, and Aiken followed him. As I was getting ready to hang up, Aiken called me out into the lube room. When I got out there, I saw Aiken had the man backed into a small storage area. Aiken was pointing his silver colored, .22 caliber automatic at the man. The man was just standing there, with his hands probably held about half way up. Aikens reached over, and pulled a key off the mans belt, that was attached to a string of some sort. Aiken handed me the key, and told me to go check the cash box. I took it, and went into the office. I opened the cash box, on the counter against the wall, with the key. The box was empty, so I returned to lube room, and told Aiken. At that time, Aikens asked the man, where the money was. The man said he had just come back from taking the money somewhere. At that time, Aikens hit the man in the face, with his left hand. The man said, 'please, I have heart trouble,' and put his hands over his face. When he said this, Aikens kind of clubed the man behind his head, with his left hand, and the man fell on the floor. As the man was laying on the floor, Aikens went through his pockets. He took the mans wallet from his back pocket, and some money from the mans shirt pocket. Aikens then asked the man if he had any more. The man didn't say anything, just laid on the floor. At this time, I went out to the car, to start it, because I had been having trouble getting it started. I was trying to start the car, when I heard about four or five gunshots, from the station. I looked back toward the station, and saw Aikens walk out of the lube, into the office. He stood there for a few seconds, looking around, then he walked on outside, and got into my car. I managed to start the car, and I drove away, going north on Empire, and on into Seattle. I drove to Occidental and Yesler, and we went to Macs Show Place.

"On the way from the station, to Macs Show Place, Aiken divided the money we had got. My share was about thirty eight dollars. We remained at Macs Show Place till closing time, then we drove back to Paine Field. We returned to our barracks, and Aikens kept possession of his gun."

APPENDIX V.

Defendant Aiken's statement regarding the Owen Fair murder:

"On a Friday or Saturday night, near the end of March 1965, around 11:00 P.M., I was with Antonio Wheat A/3 class, in his automobile, in Seattle, Washington. We were en route to Wheats girl friends house, and we had just left Macs Show Place, at 2nd and Yesler Ave. We were headed for a Time Oil Station, that was located, south of the ball park, on Empire Way. About a week before this, Antonio Wheat had mentioned that he knew of a service station, that had quite a bit of money, and would be easy to get. He was referring to a robbery. We had talked about pulling an armed robbery, but I didn't think he had been serious about it.

"On this particular night, we proceeded in Wheats 1954 Ford, to the Time Oil Station on Empire, just south of the ball park. Wheat pulled into the station lot, and parked his car behind another vehicle, near a white fence. We both got out of the car, and walked up to the building. There was a middle aged, fat white man in the station office. Wheat and I walked into the office, and Wheat talked to the man, about something being wrong with his car. The man told Wheat that he couldn't fix his car, that he was ready to close, and mentioned some other place where Wheat could take his car. The man then went into the lube room, and began turning off the station lights. Wheat and I remained in the office, until the man came back into there from the lube room. As the man started back into the office, I pulled out my silver colored, .22 caliber automatic, and pointed it at the man. I was carrying the gun in my inside jacket pocket. I think I held the gun in my left hand. I told the man to get back in there, and the three of us went back into a side room off the lube room. I told the man to give me the money, and he didn't say anything, just started to reach into his right front trousers pocket. As the man did this, Antonio grabbed the mans wrist, and reached into the mans pocket himself. Wheat pulled some money, paper currency, out of the mans pocket. Wheat then reached into the mans front shirt pocket, and took out some more paper currency. I told the man to turn around, as he was facing me. The man turned around, and I put my gun in Wheats hand, as he reached for it. At the same time, Wheat handed me a small, white colored can, of ether. I had got this can of ether, from the base dispensery [sic], about two or three days before, and had given it to Wheat, and he had placed it in his car.

"After Wheat had given me the can of ether, I poured a large amount into a rag I had picked up. I reached around the man, and quickly placed the rag over his mouth and nose. He struggled for a few moments, but I held on to him. The man went limp in my arms, and I laid him on the floor.

"Wheat handed my gun back to me, and he then grabbed a key, on a white string, that was tied to the mans belt loop. I stood, and covered the man with my gun, as Wheat went into the station office to check the cash drawer. Wheat came back and said there wasn't anything in there. I suggested we leave. The man was still laying on the floor, and

he was mumbling. Wheat said we couldn't leave yet. I asked him what in hell he was talking about. Wheat replied that we had to shoot him, referring to the man on the floor. I told Wheat I wasn't going to shoot him, so Wheat told me to give him the gun. I then handed the gun to Wheat, and stepped back by the doorway. Wheat then leaned over the man on the floor, and fired at least four shots into the mans head. I believe another shot hit the man in the chest. The man was laying flat on his back when he was shot, and I estimate that Wheat held the gun about one foot away from the man, when he shot him. After the shooting, I turned, and walked out of the station, going back to the car. A few moments later, Wheat came out, and walked back to the car. Wheat got in and we drove off. We drove back toward the ball park for a couple of blocks, and parked behind a near by store. Wheat counted the currency we had got from the Time Station man, and it totaled about seventy dollars. Wheat divided it, and gave me my half, which was a little over thirty dollars. Wheat had evidently got some change also, from the station office, and he put this in the glove compartment of his car. Wheat had also taken a new battery from the station, and placed it on the rear floorboards of his car. After we divided the money, we then drove back to 2nd and Yesler, and parked. Wheat and I, then returned to Macs Show Place, where we remained till closing time. After closing time, Wheat and I returned to Paine Field, taking along several other air force personal [sic] we met at Macs Show Place.

On returning to base, Wheat parked the car across the road from the main gate, and we walked back to our barracks. I took my gun with me, because Wheat had given it back to me, and I locked it in my wall locker. We had thrown the can of ether, and the rag away, after we left the Time Station. . . ."

## Appendix VI.

Defendant Wheat's statement regarding the Daniel Wolf murder:

"On a Sunday night, about two weeks ago, around midnight, I was driving my 1954 Ford, Washington license BCK 090, in Seattle, Washington. A friend of mine Airmen Third Class, Arthur Aiken, was riding with me. I had driven by my girls house, in the 7100 block, Holly Park Drive, saw the lights were out, and decided not to go in. I then started driving back north, headed for the base at Paine Field. I proceeded north on Empire Way, from Othello St. After turning on to Empire Way, I stopped nearby, at a Douglas Station, and filled my car up with gas. It took about $3.25, worth, and I paid the attendant in cash. I started out, going north on Empire Way again. I had gone a short distance, when I noticed my oil indicator light, flashing red, so I pulled into a Enco Station, on the right side of the road. A young male attendant, come over to the car and checked the oil for me. He told me I was about two quarts low, so I told him to put in two quarts of bulk oil. Meanwhile, Aikens had gotten out of the car, and went to the mens rest room. The attendant put the oil in the car. When he did this, Aikens come out of the rest room, and went into the station office. The attendant

told me the price of the oil, which was about sixty or seventy cents, and I gave him a five dollar bill. The attendant went into the station office with the bill, and I got out, and followed him into the office myself. At this time, Aikens pulled out his silver colored, .22 caliber automatic, pointed it at the attendant, and told him, this was a holdup. The attendant told Aiken that he would give him the money, or anything he wanted, and that he was a very religious man, and that he didn't want any trouble. Aikens replied that he didn't want to hear all that, and he just wanted the money. The attendant then opened the cash box, taking out all the money, offering it to Aikens. Aiken told me to take it, so I did, placing it in my right coat pocket. At that time, Aikens asked if that was all the money, and the attendant said there was more money in the safe. Aikens asked if he could get in the safe, and the kid replied yes, and took a key out of the desk drawer, and opened a floor safe behind the counter. After opening the safe, Aikens told the attendant to step back, and he then took the money out of the safe himself. After getting the money out of the safe, either Aikens or the attendant replaced the top of the safe. Aikens then ordered the kid out from behind the counter and said, 'lets go in the back.' The three of us then walked back to a small store room, at the rear of the lube room. When we got back to the store room, the kid asked if he could pray. Aikens didn't say anything, and the kid got down on his knees, and started praying out loud, I don't recall what he said. The kid had his head down, and his hand over his eyes. He had said a few words, when Aiken shot him once in the head. Aiken was standing near the kids left side, holding his gun in his right hand. After firing the first shot, the kid fell forward, and Aiken shot him again. After the shooting, Aiken, and I, walked out to where I had left my car, parked at the outside gas pumps. We got in, and I drove back to Paine Field. On the way back, Aiken divided up the money we had gotten. We got about three hundred dollars in all. When we got back to Paine Field, I parked across the road from the main gate, in a parking area there. We got out of the car, and we then burned some miscellaneous papers, and checks that we had gotten along with the money. We did this behind my car, and I used my cigarette lighter to start the fire. We both went back to the barracks, and Aiken kept possession of his gun."

APPENDIX VII.

Defendant Aiken's statement regarding the Daniel Wolf murder:

"On a Sunday nite about two weeks ago sometime in the middle of April I was with Antonio Wheat, an Airman I am stationed with at Paine Field. We were in Wheats car a 1954 Ford 2 tone Brown. It was about midnight and Antonio was driving in the So. end of Seattle on Empire Way So. We had discussed maybe robbing a gas station and as we drove by an Enco Station Wheat said that looks like a good one there is only one man there. So he drove a couple blocks up the side street beside the station went around the block and parked on the same street just north of the station. We walked across the street and the attendant was alone in the lube room at a bench just in front of a car.

He had his back to us. He was working on a car battery. The attendant was about 23 or 24 years old with blondish hair. Wheat asked the attendant what could cause his car to vibrate. Wheat and the attendant discussed the car for a few minutes. I was carrying a .22 cal auto. Italian make in my coat pocket. I took the gun out of my pocket holding it in my left hand. I told him to turn around but I guess the attendant didn't hear me so I said it a little louder. The attendant asked if this was a hold up when he saw the gun. I told him what did it look like. He then said he didn't want any trouble and would give us the money. Wheat walked to the office followed by the attendant and I walked in the rear I had put the gun back in my pocket.

"The attendant took the money from a cash box on the end of a counter and laid it down. I picked it up and put it in my pocket. We were getting ready to leave when the attendant said he had more money in the safe. Wheat asked him where the safe was and could he open it. The attendant said he could. The attendant pulled open a desk drawer so Wheat went around to see what he was doing. The attendant showed Wheat a key. The attendant picked up the key and bent down just behind him in the corner and opened up the floor safe. Before the attendant could get the door off Wheat pulled him back and took the door off himself. Wheat reached in the safe, started pulling out the money and put it in his pocket. He then asked the attendant if he could get into the bottom of the safe but the attendant didn't have that key. Wheat then put the safe door back on. Wheat then said lets go and pushed the attendant and we all went back to the lube room. Wheat told the attendant to go into a small side room just off the rear of the lube room. The attendant said the money was insured he was very religious and didn't want to die. Wheat pulled out a small switch blade knife and forced the attendant into the room. Wheat said to me do you want to do it or should I. I said I wouldn't do it. Wheat handed me his knife and I gave him my gun. I knew he was going to shoot the attendant. I closed the knife and put it in my pants pocket. When Wheat pointed the gun at the attendant, the attendant said he wanted to pray. The attendant got down on his knees and covered his face with his hand. I turned around and walked toward the front of the station. I heard one shot then a few seconds later I heard another shot. Wheat then came out of the room, we walked to the car and drove off. I knew Wheat had shot the attendant. Wheat drove south on Empire Way and then pulled up behind a store. He then counted the money. I think it was around $200.00 in cash. And also some checks and other papers. He then gave me about half of the money. I think I got $94.00. Wheat started to drive around town I told him lets leave and we drove back towards the Base on the way he gave me back my gun and I gave him his knife. We got back about 2:00 A.M."

## Appendix VIII.

Defendant Wheat's first statement regarding the James Harp murder:

"On April 23, 1964 at approximately 6 P.M. I left the base at Paine Field with Arthur Aiken, a negro male airman 3rd class attached to

Paine Field where I am stationed. We walked through the main gate and to my car, a 1954 Ford sedan with a dark brown top and a tan bottom, license BCK 090 which was parked in a parking lot a half block from the main entrance.

"We then got in the car and drove south on Highway 99 to Seattle, Washington.

"I did the driving. We then drove to the Holly Park Housing project located in the south end of Seattle, Washington to see my girl friend Dorothy Carpenter, a negro female. We arrived at 7 P.M. and stayed until 8 P.M. During the hour we had one drink of whisky a piece. At approximately 7:30 P.M. Dorothy's sister Rosemary Thomas and the baby sitter Machelle, last name unknown came into the house.

"When Arthur Aiken and myself left we took Rosemary and Machelle and dropped them off at a Housing Project on the way into Seattle, Washington. We then drove north on Empire Way to Rainier avenue, then north on Rainier avenue to 23rd south and then north on 23rd south to 15th ave apast the University district and then north on 15th avenue until it was dead end and then we turned left to Aurora avenue and then right on Aurora avenue to Everett, Washington and to the home of Eric Brown, a negro male, airman 3rd class stationed at Paine Field. His address is 801 Linden Avenue, Everett, Washington. After we found that Eric Brown was not dressed and ready to go with us we walked about a block to where Edwin Jone's lives. We stayed at his home until approximately 11 P.M. and then walked back to Eric Brown's home.

"While we were at Jone's home Aiken's got a record from him titled 'Whose afraid of Virginia Wolf.' We then left and drove back to Seattle, Washington on Highway 99. Eric Brown and Arthur Aiken was with me. We drove to Mac's show place at Yesler and Occidental, Seattle, Washington arriving about midnight. Eric Brown went into Mac's show and right back out.

"Eric said there wasn't many people in the place. We then drove to the Black and Tan night club at 12th avenue and Jackson street. The three of us went in and right out as there wasn't many people there. We then drove to the Go Go night club near the Freeway and we couldn't get in as we didn't have Washington State Liquor Card's. We then drove out Eastlake avenue to 45th avenue and turned right on 45th avenue to 15 avenue and turned left on 15th avenue and drove north to 205th where we hit the freeway and drove north back to Eric Brown's home. This was about 1:30 A.M. From Brown's house I drove to a service station on Broadway in Everett, Washington where I used the men's rest room.

"Arthur Aiken was still with me.

"I didn't want to go back to the base so Arthur suggested we go back to Seattle, Washington which I agreed. We took the freeway back to Seattle, Washington arriving at approximately 2:15 A.M. We drove around the south side or the Jackson street area for about a half hour. I then started to drive back to Paine Field going by the way of the University district. I proceed north on 15 avenue and

when I got out of town·I stopped at a Douglas gas station located on the left side of the highway. I pulled into the left side of the lube room and parked beside another car. At this time Aiken was asleep. This was approximately 3 A.M. I then went into the station office and asked the attendant for the key to the rest room. He was about 20 yr's and he had on a blue slicker outfit.

"He pointed and said it was on the counter. The key was on a can about the size of a beer can. I took the key and unlocked the door to the men's rest room and used the bath room. I then returned to the office and put the key back on the counter and then walked back to the car and sat down in the front seat behind the wheel. I smoked a Pall Mall cigarette and threw the butt out the open window. I laid my head back to relax and fell asleep. About 4 A.M. I woke up. Aiken was still asleep. I then went into to use the telephone to call the base and there was no answer. I then talked to the attendant for about a half hour.

"About 4:25 A.M. a car drove in which I thought to be a General motor's car. Two men about 19 or 20 yr's got out of the car and came into the station. There was a girl in the car with them.

"She went into the wash room and they stayed in the office until she came out. While they were in the office·they introduced themselve's and I shook hand's with them and they then left. They were in the office about five minute's.

"After they left I thought about calling the base again and I looked at a clock on the station wall and it was about 4:35 A.M. and I decided not to call. I then returned to the car and got in on the driver's side. At this time Aiken woke up and asked me what time it was and I told him 'it was about twenty minutes till 5.'

"I told him I was going back to the base and he said 'hold on a minute.' At this time Aiken got out of the car and walked into the station office. A few second's later Aiken walked out of the office with the attendant to the pump area. Aiken's has both hand's in his pocket's. They were standing together for a few second's and I then saw them walk back toward's the station and around the corner toward's the men's rest room. About two minute's later I heard a noise that sounded like one gun shot. A few second's later I heard two distinct noise's that sounded like gun shot's spaced close together. A few second's later he came walking around the corner with his hand's in his pocket's. He walked to the car and he said 'let's go.' in a hurry tone of voice. I then started the car and proceeded north on 15th avenue to 205th where I picked up the freeway. I continued north to the Mulkiteo [sic] cut off where I left the freeway. I then turned left and headed west toward Highway 99.

"At this time Aiken's handed me a silver colored small gun and some paper currency and he said 'I want you to get rid of this for me' and I asked him 'what was I supposed to do with it' and he said 'I don't know. I don't need it any longer.' We didn't say any more and I put it on the front seat and left it there until we parked in the lot near the gate to Paine Field. I then put the gun and money in my pocket and we got out and I locked the car and we then walked to and

through the main gate to the barrack's. We both went inside and we split up there. I told Aiken's 'I would probably see him tomorrow.' I went to my quarter's, room 112 and took my coat off and then I walked to the storage room 115 and opened the door with my key and went in and I hid the gun and a box of shell's in my blue air force dufflebag. I then went to my room and I counted the money Aiken's gave me and it was five, ten dollar's bill's, a total of $50. . . ."

APPENDIX IX.

Defendant Wheat's second statement regarding the James Harp murder:

". . . I wish to make a correction to a statement I gave to Detective Mullen and Sgt. Crider on April 24, 1965 at 11 P.M. at Paine Field Air Base.

"When I walked to the car at twenty minutes till five and Arthur Aiken woke up we had the following conversation. He asked me the time and I told him 'it was about twenty minutes till five' and I told him 'I was going back to the base' and he asked me 'where I had been' and I told him in the station talking to the attendant.

"He asked if the attendant was alone and I told him I guess so.

"He then made the suggestion we rob the service station and I said 'no.' He then said 'why not,' your not a millionaire and neither am I' and he said 'we could both use the money as your thinking of going home to get married.'

"He got out of the car and I got out and followed him. Aiken's went into the office and I stood by the front door. Aiken's and the attendant came out and the three of us walked to the cash drawer by the pump's and Aiken's asked the attendant for change for a twenty dollar bill. The attendant opened the cash drawer and Aiken said 'on second thought give it all to me.' The attendant said 'the money is insured don't kill me.' Aiken's then said again 'give me all the money' and the attendant give him all the currency from the cash box. He then put the money in his left pant's pocket.

"He then told the attendant to walk toward's the back and as we reached the men's rest room he gave the attendant the key which he took out of his own pocket and was attached to a small can.

"At this time he pulled a gun out of his right coat pocket and pointed it at the attendant. The gun Aiken was holding was a silver colored small automatic.

"Aiken told the attendent 'to go inside' and the attendant said 'what are you going to do'? Aiken said 'just go inside' and the attendant opened the door and the three of us went inside.

"The attendant turned around and said 'don't kill me.' At this time the attendant sat down on the nearby toilet seat. Aiken's said 'what do I look like' and the attendant replied 'just an average looking fellow.' At this time I turned and stepped toward the door saying 'let's get out of here.' At this time I heard a shot and I stopped and realized Aiken's had shot the attendant. I then heard two more shot's

and then I opened the door and went outside. I ran to the car and got in and started up the motor and Aiken's came running and got in the front seat beside me. I then drove north on 15 avenue toward's Paine Field air base. As I related in the previous statement what I said about Aiken giving me the gun and fifty dollar's of the money we got in the robbery is true.

"Parking the car, going into the base, and hiding the gun in my duffle bag is also true."

## Appendix X.

Defendant Wheat's third statement regarding the James Harp murder:

". . . I wish to make a correction to a statement I gave . . . April 25, 1965 . . . ."

"When I drove into the Douglas service station on April 24, 1965 at approximately 3 A.M. Arthur Aiken was awake. I got out of the car and got the key on a can about the size of a beer can to the rest room. I then used the key to unlock the door to the men's rest room and went in to urinate. I then gave the key back to the service station attendant. I then walked to the car and got in on the driver's side. We then sat and talked for awhile. I fell asleep and then woke up at approximately 4:15 P.M. Arthur Aiken was asleep. I then walked into the station office to use the phone. I call Paine Field Air Base and there was no answer. I talked to the service station attendant until his two friend's drove up and left. After they left I asked the attendant for change for a twenty dollar bill. We then walked out to the cash box by the pump's.

"After he opened the cash box I pulled the 22 silver automatic out of my right pocket and told him 'give me all the money, this is a holdup.' He then told me to take all the money as it was insured and he wasn't. He took all the currency out of the cash box and handed it to me. I took the currency with my left hand and put it in my left coat pocket. We went back in the office and I told him 'to get the key to the men's rest room.' He picked up the key from the counter and I told him to walk into the men's rest room which he did and I followed him. After we got into the rest room he sat down on the toilet and before he sat down he said 'don't kill me.' I asked him if he could describe me and he said he didn't know. I also asked him if he could describe the car if he had to and his reply was 'don't kill me.' I asked him again if he could describe the car and he said 'he probably could.' He started talking and I don't remember what he said and I told him to shut up and he kept on talking. I then released the safety on the gun and the first shot went off accidentally. He slumped over and I then fired two more shot's after I aimed at his head. After the first shot was fired he dropped the key on the floor. I then went outside and ran to the car. I then got in the car and started the motor. Arthur Aiken was still asleep. As I stated in the previous statement I drove back to the base and on the way I counted the money which

amounted to $120.00. The 22 automatic I used I had taken from Arthur Aiken's pocket on the early morning of April 21 or April 22, 1965. When I sneaked into his unlocked room at the barrack's. . . ."

## APPENDIX XI.

Defendant Aiken's statement regarding the James Harp murder:

"On 4-23-65 I left Paine Air Base, with Antonio Wheat in his car a 1954 Ford 4 dr. Sedan two tone brown, this car also has a black hood, I believe we left the base about 3:30 P.M. Antonio told me that he had to go to his girls house, because he had to drive her to the Laundromat. We got to his girls house about 6:30 P.M. her name is Dorothy and she lives out on holly park drive in the south end of Seattle, Wn. Antonio and I went into the house, and stayed about one hour. When we left we drove one of Dorothys sister and another female friend to their home, then Antonio and I drove back to Everett, Wn, and drove to a friends home Eric Brown. When we got to Browns home he was going to take a bath so Antonio and I walked over to another Airmans house Edwin Jones home I wanted to go there because I had lent him two records that belonged to me. I picked up one of the records, and not the other as Jones wife had lent it to one of her friends. Antonio and I then walked back to Eric Browns house and he was ready to go with us so all three of us got into Antonios car and drive to Seattle. We left Browns house about 10:30 P.M. 4-23-65. We all drove down to a dance place near 2nd & Yesler in Seattle, the name of the place was Macks Show Place. Eric got out of the car to see if there were any people there, and jumped back in and it didn't look like there was much action. So we drove up to 12th & Jackson to another spot the Black & Tan. We all got out of the car and walked in the entrance to this place and looked inside but we did not want to pay the cover charge as there weren't to many people there. We all got back into the car, and drove to another place we had heard about I believe they call it the Go-Go this is the name. We were stopped by the officer at the door and because we did not have Washington State I. D. Liquor cards, he would not let us in. We all got back into the car and started to head for Everett to take Eric back home by this time it should have been a little after 12:00 midnite. I do not recall what time we dropped Eric at his home because I had gone to sleep in the back seat. I don't recall the time but when Eric got out of the car I woke up and got in the front seat next to Antonio. After we dropped Eric off Antonio drove to a gas station on highway '99' north of Everett, Wn. and Antonio got out of the car and went to the rest room. I remember that when Antonio got back into the car after using the rest room and we drove toward Seattle, Wn. The next time I woke up I saw that we were in a Douglas gas Station some place in the northend of Seattle. I woke up and asked Antonio why we were parked there and he said that he pulled in there because he was sleepy and wanted to rest a little while I remember that Antonio got out of the car I don't know where he went I went back to sleep, and I did not wake up again until we were in the parking lot across the street from the main gate

at the Air base. I don't recall what time this was but it was light. Antonio and I both got out of the car and went into the base we both live in the same barracks I live upstairs and Antonio lives down stairs I went to my room and he went to his. . . ."

---

May 16, 1969. Petitions for rehearing denied.