[Nos. 41885, 41888.    En Banc.    May 3, 1973.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS EUGENE BRAUN *et al.*, *Appellants*.

158

*Anderson, Hunter, Carlson & Dewell,* by *William W. Baker,* for appellant Braun (appointed counsel for appeal).

*Williams & Novack* and *Edward D. Hansen,* for appellant Maine (appointed counsel for appeal).

*Robert E. Schillberg, Prosecuting Attorney,* and *David G. Metcalf, Deputy,* for respondent.

STAFFORD, J.—A jury found the codefendants, Braun and Maine, guilty of first-degree murder, first-degree kidnapping, robbery and larceny by possession. The jury also determined that defendant Braun should receive the death penalty. Both defendants have appealed.

Codefendants began a 6-day crime spree with the burglary of a store in Twisp, Washington, where .22 caliber pistols and some ammunition were stolen. Thereafter they kidnapped a young woman in Snohomish County, murdered her and stole her car. They continued with the robbery of a hotel in Seattle, another murder and car theft in Oregon, another murder, rape, attempted murder and a kidnapping in California. Finally, they were arrested in California.

Defendants were incarcerated in California during which time each made a confession. They were tried jointly in California and found guilty of multiple crimes. Codefendant Maine testified at the trial and attempted to excuse his participation in the crimes by placing the primary blame upon Braun. Maine received life imprisonment and Braun was sentenced to death.

Subsequently, they were returned to Washington and

charged jointly with the crimes committed in Snohomish County. Their motions for change of venue were denied. Pursuant to stipulations signed by defendants, the jury was permitted to separate during both the guilt and penalty phases of the bifurcated trial.

Defendants were found guilty of all charges. The death penalty was imposed upon Braun, and Maine was sentenced to life imprisonment. The defendants' separate appeals have been consolidated for the purpose of review.

Defendant Braun assigns error to the admission of his California confession. He claims that he had not made a knowing and intelligent waiver of his rights.

Following their arrest on the morning of August 22, 1967, defendants were taken to the county jail in Sonora, California. At lunchtime Maine told the jailer that Braun had "killed them." He was cautioned to say no more. At about 12:30 p.m., in the presence of the jailer and a court reporter, Maine was interrogated by Agent John Smoot of the California Department of Justice. Mr. Smoot identified himself as a police officer, informed Maine of his constitutional rights and that he was under suspicion of attempted murder. Maine indicated that he understood his rights and was willing to talk. Thereafter, he confessed to the entire series of crimes but placed primary responsibility for the murders upon Braun. Maine does not challenge his own confession.

Shortly thereafter, Agent Smoot interviewed Braun. A court reporter was present. The record indicates that Smoot identified himself as a police officer and gave Braun the warning required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). Although Braun asked some questions about the appointment of counsel, his immediate concern was to talk with Maine rather than with a lawyer.[1] Furthermore, he asserted his right to remain silent and the interview terminated.

[1] "Do you understand all those rights as I have explained them to you?" A. "Um-hum, I think so." Q. "Do you have any questions about them?" A. "Yeah." Q. "What are they?" A. "Who's going to be ap-

Pursuant to CrR 101.20W the Washington trial court conducted a hearing on the admissibility of Braun's confession. The court found that while it was unclear whether Braun actually waived his right to counsel during the first interview, he clearly did so in the second. On that occasion Braun was again informed of his constitutional rights, including his right to have counsel appointed and present during questioning. He indicated that he understood his rights, waived them and confessed the entire series of crimes, assuming sole responsibility for the actual killings.

■ There is substantial evidence to support the trial court's determination that Braun made a knowing and intelligent waiver of his rights and voluntarily confessed. Reading the court reporter's transcript of the first interview in the light most favorable to Braun indicates that he was asserting his right to remain silent until he talked to Maine and he wanted to check with Maine to determine what arrangements to make about counsel. In fact, he testified at the pretrial confession hearing that the reason he wanted to talk with Maine was to "Find out basically whether or not he had the funds to hire an attorney, or whether his parents might be able to hire one."

Clearly this is not a case in which a defendant asserted his rights and the police refused to take "no" for an answer. See State v. Blanchey, 75 Wn.2d 926, 930, 454 P.2d 841 (1969), cert. denied, 396 U.S. 1045, 24 L. Ed. 2d 688, 90 S. Ct. 694 (1970). Having originally complied with Braun's

pointed?" Q. "This is something I have no control over. The court will —you mean the lawyer?" A. "Um-hum." Q. "The court will appoint the attorney for you unless you have funds to hire your own. Do you have any funds?" A. "Not to hire the lawyer I want, no." Q. "Is it my understanding what you are saying is that you do not wish to talk to us at this time?" A. "Right. Not unless I can talk with my friend." Q. "Pardon?" A. "Not unless I can talk with my friend." Q. "In other words, it's not, at this moment, now, correct me if I'm wrong—at this moment, it's not a lawyer you're interested in; what you're interested in is knowing what your friend's attitude is?" A. "No." Q. "Well, what is your statement?" A. "I just want to know what the hell he wants to do?" Q. "I see." A. "Whether he wants to hire a lawyer or whether he wants to have one appointed or what."

request, the authorities were free to question him a second time, after his rights were completely explained at the commencement of the second interview and he expressly waived them.

Braun claims his waiver was not voluntary because of deception practiced by the California police. Between the time of Braun's first and second interrogations, Agent Smoot reinterviewed Maine and told him that his confession would be admissible against Braun if repeated in Braun's presence. Immediately preceding Braun's second interrogation, Braun and Maine were allowed to confer pursuant to Braun's own request. At that time Maine told Braun that he intended to confess in his presence and that a statement so made could be used against Braun. Actually, this was a misstatement of California law.[2] It had been related to Maine, however, for the purpose of inducing Braun to confess by convincing him that denial of Maine's assertions would be futile. Braun argues that such deception vitiates his waiver as a matter of law.

■■  While we do not condone deception, that alone does not make a confession inadmissible as a matter of law. *State v. Thompson,* 38 Wn.2d 774, 232 P.2d 87 (1951). *See generally* Annot., 99 A.L.R.2d 772 (1965). Prior to *Miranda* the inquiry was whether, under the totality of the circumstances, the deception practiced was such as to make the confession involuntary. *Frazier v. Cupp,* 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969). Since *Miranda* the inquiry has shifted to whether the deception was such as to make a waiver of constitutional rights involuntary. *Thessen v. State,* 454 P.2d 341 (Alas. 1969); *see also People v. Watkins,* 6 Cal. App. 3d 119, 85 Cal. Rptr. 621 (1970); *People v. Smith,* 108 Ill. App. 2d 172, 246 N.E.2d 689 (1969), *cert. denied,* 397 U.S. 1001, 25 L. Ed. 2d 412, 90 S. Ct. 1150 (1970). The test of voluntariness is "whether the behavior of the State's law enforcement officials was such as to over-

---

[2]Since the events occurred after *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), an admission by silence would have been inadmissible.

bear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544, 5 L. Ed. 2d 760, 81 S. Ct. 735 (1961); *United States v. Robinson*, 439 F.2d 553, 570 (D.C. Cir. 1970).

■ The state bears the burden of proving voluntariness by a preponderance of the evidence, however, rather than beyond a reasonable doubt as asserted by defendant Braun. *Lego v. Twomey*, 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972); *State v. Davis*, 73 Wn.2d 271, 285-86, 438 P.2d 185 (1968). The state has met that burden. An examination of cases in which the effect of deception on the voluntariness of a confession was at issue demonstrates that the deception here involved is not the type which, as a matter of law, has been held to overbear a defendant's will to resist. Confessions have been held to be involuntary when the police have misrepresented that the accused's wife would be taken into custody if he did not confess,[3] or that a friend would lose his job if the accused did not confess,[4] or when a confession was obtained while the accused was under hypnosis.[5] On the other hand, a confession has been held to be voluntary even though the suspect was falsely told that his polygraph examination showed gross deceptive patterns,[6] or that a cosuspect had named him as the triggerman,[7] or when the police concealed the fact that the victim had died.[8]

There is substantial evidence to support the trial court's conclusion in this case that Braun's waiver was voluntary.

---

[3]*Rogers v. Richmond*, 365 U.S. 534, 5 L. Ed. 2d 760, 81 S. Ct. 735 (1961).

[4]*Spano v. New York*, 360 U.S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202 (1959).

[5]*Leyra v. Denno*, 347 U.S. 556, 98 L. Ed. 948, 74 S. Ct. 716 (1954).

[6]*State v. Keiper*, 8 Ore. App. 354, 493 P.2d 750 (1972).

[7]*Commonwealth v. Baity*, 428 Pa. 306, 237 A.2d 172 (1968).

[8]*People v. Smith*, 108 Ill. App. 2d 172, 246 N.E.2d 689 (1969), *cert. denied*, 397 U.S. 1001, 25 L. Ed. 2d 412, 90 S. Ct. 1150 (1970).

Braun was fully advised of his rights at the original interview. When he initially indicated his intention to remain silent until he talked to Maine, the interview was terminated. His request to talk to Maine was granted. At that time he discovered that Maine had already made a statement. Although Maine relayed a misstatement of the California law, there is no indication that Braun was influenced by it. At his CrR 101.20W hearing, Braun testified but did not contend that the misstatement had any influence on his decision to confess.

Prior to the second interview, at which he confessed, he was again given the *Miranda* warnings. He indicated he fully understood his rights and desired to talk. Thereafter, he fully and without hesitation confessed, assuming full responsibility for the actual killings. There is no evidence that he was threatened, coerced or cajoled by the authorities. Under such circumstances, we cannot say Braun's waiver was involuntary. The confession was admissible.

Although present in court, codefendant Maine did not testify in the instant case. The state introduced Maine's testimony, given at the Braun-Maine trial in California, concerning the Snohomish County crimes. The jury was instructed to consider it only on the issue of Maine's guilt. Braun assigns error to the introduction of such testimony. He asserts that despite the cautionary instruction, the use of Maine's testimony, given at their prior joint trial, denied his right to confront witnesses against him guaranteed by the sixth amendment to the federal constitution and article 1, section 22 (amendment 10) to the Washington Constitution.

Braun's brief states generally that *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968), "is only analogously applicable to the facts of the instant case." Orally he argued emphatically that this is not a *Bruton*-type case. Since we do not actually reach the *Bruton* issue, if any, it is sufficient to say that *Bruton* involved the admissibility of hearsay evidence of a codefendant's *out-of-court* oral confession which implicated the defend-

ant. The codefendant did not take the stand. The hearsay statement was held inadmissible because Bruton had been denied an opportunity to confront his codefendant.

For the purpose of this case, it is evident that *Harrington v. California*, 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969), has seriously circumscribed the application of *Bruton* by applying the doctrine of harmless constitutional error. In *Harrington* the defendant was tried with three codefendants, each of whom had confessed and implicated the defendant in varying degrees. Only one codefendant took the stand, although the confessions of the others were admitted. Defendant contended that admission of the other two confessions denied him the right of confrontation. The court held, however, that evidence against the defendant, including his own statement which placed him at the scene of the crime, was so overwheming that the violation of *Bruton* was harmless beyond a reasonable doubt.

In an effort to avoid the impact of *Harrington*, Braun does not rely upon *Bruton*. Rather, he depends upon *California v. Green*, 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970); *Barber v. Page*, 390 U.S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318 (1968); and *Pointer v. Texas*, 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965). In *Green* hearsay evidence, consisting of an out-of-court statement to a third party implicating the defendant, was held admissible because the declarant testified and was confronted by the defendant at trial. On an alternative and independent ground, the court held that the hearsay evidence was admissible because it consisted of testimony taken *under oath* and *subject to cross-examination* by the defendant's counsel *at a preliminary hearing* on the charges on which he was being tried. Braun asserts, however, that the use of Maine's prior testimony in California does not meet the requirements of *Green* because the Snohomish County trial involved different charges, different issues, and different lawyers.

Braun also argues that he had incompetent counsel in California, thus, attempting to bring *Pointer* into play. That

case involved a statement made by a codefendant implicating the defendant. Although made at a preliminary hearing, it was held inadmissible at trial because the defendant had not been represented by counsel at the preliminary hearing. This, the court held, denied him the right of confrontation. Braun seems to imply, but does not argue, that his California counsel's so-called inadequacy amounted to lack of representation. If this is not his position, *Pointer* is inapposite. Nevertheless, at this juncture we are left to speculate both as to the facts and the reason for citing *Pointer*.

Next, Braun contends that his right to confrontation was violated because the state did not call Maine to testify at the instant trial. He relies on *Barber v. Page, supra.* In *Barber* the court held that the transcript of a preliminary hearing, containing codefendant's testimony was inadmissible at the defendant's subsequent separate trial because the state made no showing of a "good faith effort" to have the declarant present to testify. At the time, the declarant was in prison.

Braun urges that by joining the two trials the state deliberately attempted to circumvent *Barber*. It should be noted, however, that there is neither an indication that the state was in a position to call Maine, although he was present in court, nor an indication that Braun attempted to call him either in or out of the jury's presence.

■ However, whether this case is distinguishable from *Bruton* or is more properly decided under *Green, Pointer* and *Barber*, the right to confrontation remains the central issue. *Harrington* makes it clear that the doctrine of harmless constitutional error may apply when the right to confrontation is asserted. We held similarly in *State v. Aiken*, 75 Wn.2d 421, 452 P.2d 232 (1969), *rev'd on other grounds* in 403 U.S. 946, 29 L. Ed. 2d 856, 91 S. Ct. 2283 (1971), that an incriminating extrajudicial statement of a codefendant admitted without the codefendant testifying at the trial is not a denial of the right to confrontation where the evidence of guilt is overwhelming. In Braun's case, evidence of guilt is stronger than in either *Harrington* or *Aiken*. In

those cases the defendant's statements admitted participation in the events which culminated in the murders charged, but in each the defendant denied that he had done the killing. Here, Braun not only implicates himself in the murder but takes sole responsibility for being the triggerman. This, together with the fact that the confessions of Braun and Maine agree in the smallest detail on their respective participation in the crimes charged, makes the admission of Maine's prior testimony harmless beyond a reasonable doubt, if it is error at all.

■ Defendant Braun next assigns error to imposition of the death penalty, claiming it is cruel and unusual punishment thus violating the eighth amendment to the federal constitution. The United States Supreme Court has recently held, by a plurality rather than by a true majority opinion, that the death penalty violates both the Eighth and Fourteenth Amendments when determined and imposed in the manner now provided by law. *Furman v. Georgia*, 405 U.S. 912, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972).

We are obliged to follow its interpretation of the federal constitution and do so in this case, there being no significant difference between the result of the law challenged in *Furman* and our own. Thus, we hold that the death penalty, as now determined and imposed under existing laws of this state, is unconstitutional under the eighth and fourteenth amendments to the federal constitution. *State v. Baker*, 81 Wn.2d 281, 501 P.2d 284 (1972); *State v. Vidal*, 82 Wn.2d 74, 508 P.2d 158 (1973).

Defendant Maine claims the refusal to grant a change of venue resulted in the denial of his right to trial by an impartial jury guaranteed by the sixth amendment to the federal constitution and article 1, section 22 of the state constitution. It is also asserted that it violated his right to a fair trial secured by the due process clause of the Fifth and Fourteenth Amendments and article 1, section 3 of the state constitution.

■ The granting of a change of venue is discretionary. *State v. Stiltner*, 80 Wn.2d 47, 491 P.2d 1043 (1971); *State*

*v. Hawkins,* 70 Wn.2d 697, 425 P.2d 390 (1967). Defendant Maine has shown no prejudice. The Snohomish County trial was conducted 3 years after the commission of the crimes. No surge of community reaction preceded the trial. Press coverage at the time codefendants were returned to this state was minimal. The facts here differ from those in *Stiltner* wherein we held that the trial court erred by denying a change of venue. In *Stiltner* the accused was well known in the community and there was considerable pretrial publicity, including accusatory newspaper articles. No such abuse of discretion occurred here.

Both defendants attack the trial court's failure to sequester the jury, contending it is possible they were subjected to prejudicial publicity thereby. A review of the facts indicates that prior to the trial the defendants and the state entered into a written stipulation to allow separation of the jury. The trial court approved and the separation was ordered. The defendants argue, however, that such stipulation did not relieve the trial court of its duty to provide them with a fair trial by an impartial jury untainted by prejudicial publicity.

The trial court directed its attention toward that very goal. On the first day of jury selection the court carefully and fully instructed the jury against reading or listening to any news reports of the case, or any criminal case, and to forego discussion of the case with others. Thereafter, copies of such instructions were given to all prospective jurors who were not initially excused for cause or released by stipulation. The jury panel was finally completed, all jurors were sworn, and the trial began on October 27th. At the end of that trial day the jurors were again reminded of the instructions previously given. In addition to the foregoing, the trial court issued a pretrial order which prohibited the news media from reporting any testimony ruled inadmissible after a hearing in the absence of the jury.

On October 29th an article regarding the trial appeared in the Seattle Times, an evening paper of general circula-

tion in Snohomish County. The story violated the court's order by reporting certain evidence of the California crimes which had been heard in the absence of the jury and was ruled inadmissible by the trial court.[9] The article appeared in the third section of the paper and the sensitive material was located in the middle of the story. Prior to the jury's separation on the day the news item was published, the trial judge learned of the report. Before releasing the jury for that day he specifically instructed them not to read *any* newspaper articles that evening. The next day, the jurors were furnished with edited copies of the paper.

Defendants make no showing of actual prejudice. They assert, however, that such an affirmative showing is unnecessary because prejudice is presumed. In support of their position they rely on *Sheppard v. Maxwell*, 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966); *Estes v. Texas*, 381 U.S. 532, 14 L. Ed. 2d 543, 85 S. Ct. 1628 (1965); *Marshall v. United States*, 360 U.S. 310, 3 L. Ed. 2d 1250, 79 S. Ct. 1171 (1959); *State v. Stiltner*, 80 Wn.2d 47, 491 P.2d 1043 (1971); and by analogy, *Turner v. Louisiana*, 379 U.S. 466, 13 L. Ed. 2d 424, 85 S. Ct. 546 (1965) and *State v. Parnell*, 77 Wn.2d 503, 463 P.2d 134 (1969).

The factual circumstances in this case, however, are far different than in the above-cited cases. In *Sheppard* the defendant had been the subject of extensive unfavorable news coverage both long before and during the trial. Representatives of the press overran the courtroom. The Supreme Court found a denial of due process in the general carnival atmosphere that surrounded the trial and the fact that the trial judge had made no attempt to protect jurors from the inflammatory output of information by the news media. A similar circus atmosphere prevailed in *Estes*

---

[9]The trial court ruled that the offending reporters were in contempt of court for violation of its order. We reversed, holding that the order violated the first amendment to the United States Constitution. *State ex rel. Snohomish County v. Sperry*, 79 Wn.2d 69, 483 P.2d 608 (1971), *cert. denied*, 404 U.S. 939, 30 L. Ed. 2d 252, 92 S. Ct. 272 (1971). We were not called upon to decide whether the article had any effect upon the defendants' right to a fair and impartial jury.

where pretrial proceedings were broadcast and telecast live from the courtroom to a vast audience. In *Marshall,* a case more factually allied with the facts presented here, several jurors were shown to have *actually read* the prejudicial articles. The court ordered a new trial. In *Stiltner* numerous accusatory newspaper articles were disseminated to the public implicating the defendant who was well known in the community. It also appeared that the prosecuting attorney had even participated in press releases. The issue was whether the denial of a motion for change of venue was proper. We held such denial was an abuse of discretion. But there the prejudice occurred well before trial at a time when the trial court was not in a position to exercise control over the jurors or to protect them from exposure to it. In *Turner* two deputy sheriffs, who were also state witnesses, conducted the jury from place to place during the trial. The familiarity that would naturally develop in such a situation was obviously prejudicial. In *Parnell* there was a failure to excuse, for cause, a prospective juror who had *actually heard testimony* at the preliminary hearing of the case. Thus, *Parnell* on its facts is closely analogous to *Marshall.*

Considered in the abstract the news article in the instant case might have been potentially prejudicial. But it was not prejudicial in fact. The possibility of any juror having seen it is so remote that the rule of "presumed prejudice" found in the above-cited cases is inapplicable. Here the court exercised tight control over news reports of the trial. There was one, and only one, breach of that control. It consisted of potentially prejudicial material in an evening newspaper which, prior to the jury's dismissal for the day, the court specifically ordered them not to read. Aside from that specific order, the court had continually instructed the jury not to read news accounts of the trial. It must be presumed that the jurors followed the court's instructions. *State v. Studebaker,* 67 Wn.2d 980, 983-84, 410 P.2d 913 (1966); *State v. Costello,* 59 Wn.2d 325, 332, 367 P.2d 816 (1962). In light of these facts we cannot say that

defendants were denied due process of law or a trial by an impartial jury.

■ Defendant Maine assigns error to the trial court's denial of his motion for mistrial or for new trial, but has not briefed the issue. Assignments of error unsupported by argument are deemed waived. *State v. Boggs*, 80 Wn.2d 427, 495 P.2d 321 (1972).

Finally, counsel for defendant Braun alleges he was notified that this court places a $1,000 ceiling on attorney fees in capital cases. He argues that the amount is inadequate and has the effect of being a prior restraint on the diligence of counsel with the consequent effect of depriving the defendants of their "full measure" of due process and equal protection.

The argument is without merit. First there is no such ceiling. Second, attorney fees on appeal are within the sound discretion of this court. Finally, the competence of the briefs of both counsel as well as their oral arguments belie any possibility that either defendant was denied due process or equal protection of the law. The award of attorney fees actually made in this case is entirely appropriate.

The judgment of the trial court is affirmed as to defendant Maine. As to defendant Braun, it is reversed only as to imposition of the death penalty. Defendant Braun is remanded to the trial court for resentencing on the crimes of first-degree murder and first-degree kidnapping.

FINLEY, ROSELLINI, HUNTER, HAMILTON, WRIGHT, and UTTER, JJ., concur.

HALE, C.J. (concurring specially)—I concur in the remand for resentencing not because I believe the death penalty now is or ever has been unconstitutional in this country, but because it is unthinkable that this court affirm an execution of death in the face of the Supreme Court declaration that "the death penalty in [these cases] constitute[s] cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." *Furman v. Georgia*, 405 U.S.

912, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). As Mr. Chief Justice Burger so carefully delineates in his monumental dissent to that opinion, the court "fundamentally misconceives the nature of the Eighth Amendment guarantee and flies directly in the face of controlling authority of extremely recent vintage." Whatever personal views one may have of capital punishment and no matter how fervent his hopes for its abolition, neither represents a legitimate component of constitutional interpretation. If the death sentence is constitutional, the courts are and should be without power to abolish it. It is a fundamental tenet of self-government suffusing the whole scheme of constitutional law in this country that the defining of crimes and the prescribing of punishment therefor is an attribute of sovereignty to be discharged by the people through their legislative branch of government—a principle not to be denied or abridged by the judicial branch of government.

As the dissenting justices so trenchantly point out in *Furman v. Georgia, supra,* not only do the constitutions fail to deny to the states and the United States the power to apply the sentence of death for deliberate and horrendous crimes, but the constitutions in their very language authorize it. The Fifth Amendment states:

> "No person shall be held to answer for a *capital, or otherwise infamous crime,* unless on a presentment or indictment of a Grand Jury . . . ; nor shall any person be subject for the same offense to be twice put in jeopardy of *life* or limb; . . . nor be deprived of *life, liberty, or property,* without due process of law. . . ."

(Italics mine.) *See* discussion in Mr. Justice Powell's dissenting opinion in *Furman v. Georgia, supra.* Neither should the language of the Fourteenth Amendment be overlooked: "nor shall any State deprive any person of *life,* liberty, or property, without due process of law,"—a phrase which, one must assume, congruently restates the principle of the Fifth Amendment. (Italics mine.)

Although the judiciary may be the final interpreter of the constitution, it is not the only one. All offices of the

government—state, federal and local, legislative, executive and judicial—are solemnly committed to preserve, protect and defend it. It is a singular fact of history that never, since the founding of this Republic on the 4th of March, 1789, the day fixed for commencing the operations of government under the new constitution, has an American president, whatever his personal views, taken the position that the death penalty is unconstitutional. If it never occurred to George Washington, Thomas Jefferson, James Madison and Abraham Lincoln, nor any of their successors in the presidency, that the United States and the states of the Union are without constitutional authority to impose capital punishment, it is safe to assume prima facie at least that the authority has always existed and still exists today.