FILED
COURT OF APPEALS
DIVISION II

2014 JAN 28 AM 9: 52

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43191-2-II |
| Respondent, | |
| v. | |
| ADRIAN JOSEPH MAUPIN, | UNPUBLISHED OPINION |
| Appellant. | |

Penoyar, J. — Adrian Maupin appeals his conviction for first degree child molestation. He contends the trial court violated his right to due process and his right to remain silent under the Fifth and Fourteenth Amendments and the Washington State Constitution when it admitted statements he made to Kelso Police Detective Dave Voelker that he alleges were coerced and thus involuntary. In his statement of additional grounds (SAG), Maupin also argues the trial court violated his time for trial right, improperly found two witnesses' inconsistent statements reliable and admissible, and improperly treated a second *Ryan*[1] hearing as a continuation of the first *Ryan* hearing, instead of a new hearing. We hold substantial evidence supports the trial court's finding that Maupin's statements were not coerced, but were voluntary and the product of his own rational balancing of the competing circumstances. We also hold Maupin's time for trial right was not violated, the trial court properly exercised its discretion when admitting the witnesses' statements from the *Ryan* hearing, and the second *Ryan* hearing was a continuation of the first. We affirm Maupin's conviction.

---

[1] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

43191-2-II

# FACTS

## I. BACKGROUND

In 2011, Samantha West and Maupin had been close friends for over ten years and considered each other family. Maupin frequently babysat West's two children, J.W. and M.W., either at his house or at West's house. West's children referred to Maupin as their uncle.

While West was changing J.W.'s[2] diaper in May or June 2011, J.W. told West to stop touching him and that Maupin had "touched his wee wee." 1A Report of Proceedings (RP) at 51. West testified that J.W. seemed serious and kind of scared when he made this statement.

Again in July 2011, while West was watching her friends' children, J.W. "out of the blue . . . said that [Maupin] put his wee wee in my mouth." 1A RP at 59. After the other children left, West asked J.W. about what he had said and J.W. again told West that Maupin "put his wee wee in my mouth." 1A RP at 61. Also, while West was babysitting in July 2011, one of West's friend's children, J.C., who was eight at the time, heard J.W. twice state that Maupin "touched my pee pee." 1A RP at 30. West did not immediately report J.W.'s statements to the police. Instead, after she talked with her counselor about it, her counselor reported J.W.'s statements.

Detective Voelker received the case for investigation. West took J.W. to a Children's Justice and Advocacy Center (CJAC) forensic interview on July 26, 2011. When the interviewer mentioned Maupin's name to J.W., J.W. became upset and hid in an alcove in the room. Attempting to make J.W. feel more comfortable, the interviewer brought West into the room. However, when the interviewer brought up Maupin again, J.W. became angry and started pinching and hitting West, so the interviewer ended the interview. A couple weeks after J.W.'s second CJAC interview, J.W. again told West that Maupin "put his wee wee in my mouth." 1A

---

[2] J.W. was two and a half years old at the time.

2

RP at 72. West also testified that she saw behavioral changes in J.W. beginning in September 2011. She stated J.W. "pe[ed]" in places other than the toilet, and pulled down his pants and asked his brother, M.W., to kiss his "wee wee." 4 RP at 538.

After J.W. attended the *Ryan* hearing in December 2011, West noted that J.W. seemed distant. When she asked him what was wrong, J.W. said he did not want to go back to court. When West asked J.W. if he saw Maupin in court, J.W. replied, "Yeah, [Maupin] put his wee wee in my mouth. I don't want to go back there." 4 RP at 535.

## II. MAUPIN'S INTERACTION WITH DETECTIVE VOELKER

Beginning on July 27, 2011, Detective Voelker made several attempts to contact Maupin to schedule an interview. Maupin failed to attend the first scheduled interview on August 4, 2011. Maupin again failed to attend the rescheduled interview the morning of August 10, 2011. Maupin, however, showed up at the police station unannounced around 1:30 P.M. on August 10, 2011.

Detective Voelker told Maupin that because he was in a police station, everything was being recorded. Detective Voelker took Maupin to what is referred to as a "soft" interview room. 1B RP at 108. The room was approximately 12 feet by 12 feet and contained two tables and chairs. Detective Voelker and Maupin sat at the center table together, with Maupin seated closest to the door, which remained unlocked throughout the interview. Detective Voelker was dressed in civilian clothes, but he wore a firearm holstered at his side.

Before he began questioning Maupin, Detective Voelker read Maupin his *Miranda*[3] rights. Maupin never asked any questions about his rights or expressed any confusion about his rights. Maupin agreed to talk to Detective Voelker and signed the form waiving his *Miranda*

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

rights. At the time of the interview Maupin was 22 years old and had an 11th grade education. The interview lasted just under 30 minutes.

In preparation for his interview with Maupin, Detective Voelker created a "ruse" document. 1B RP at 104. Detective Voelker printed a copy of RCW 9A.44.030 from the state legislature website and altered the title to state, "Sexual contact with a minor, when permissible." Ex. 5 (Altered Copy of RCW 9A.44.030). Detective Voelker also added a "no penetration" defense to the altered printout of the statute: "FURTHER, That it is a defense that only exterior touching occurred of, body parts, without penetration however so slight." Ex. 5 (Altered Copy of RCW 9A.44.030). Detective Voelker explained that he decided to use the document because Maupin had prior experience with the police and he was educated on the interview techniques and might be leery of talking to the police, especially considering that Maupin had already failed to attend two scheduled appointments. Detective Voelker expressed his opinion that Maupin appeared to be an intelligent, articulate man who comprehended everything discussed in the interview.

At the beginning of the interview, Detective Voelker told Maupin that he could either be his friend or his enemy and that Maupin could trust him, which he reiterated throughout the interview. Detective Voelker also suggested to Maupin that he had evidence that Maupin touched J.W. from J.W.'s CJAC forensic interview. Detective Voelker told Maupin that the forensic interview "applies scientific principles to everything" and that the evidence from the CJAC forensic interview was as sure as "gravity." Ex. 5 (Interview Transcript), at 11.

Early in the interview, Detective Voelker also told Maupin that the law had "changed a little bit" since his 2004 conviction,[4] and he showed Maupin a copy of the ruse document. Ex. 5, at 3. Detective Voelker reiterated throughout the interview that no penetration was a defense and that if Maupin would confess to no penetration sexual contact, then he could close out the case. Ex. 5, at 7 ("Now you understand if you told me, yeah, I touched his—his wiener, that I can close this out. And I'm not doing anything about that because it's a defense. No penetration."); Ex. 5, at 14 ("Now—now that's not penetration either. And so, technically that's permissible too. I'm not saying do it. But I'm saying if you wanna say that, we can—we can just knock this out. That would be helpful."); Ex. 5, at 17 ("I'm just thinking there's no penetration and that's okay.").

Maupin questioned the no penetration defense and what Detective Voelker meant by closing the case out. Although Detective Voelker showed Maupin the ruse document, Maupin never actually read it, nor did he really look at it. Maupin stated that the no penetration defense was "so ridiculous." Ex. 5, at 15. When Maupin first questioned Detective Voelker about closing out the case he asked, "That would like what end this—end it all?" and Detective Voelker responded, "Pretty much . . . but I need it to be the truth." Ex. 5, at 15. The second time Maupin asked, "So if you just close the case, what does that mean? It's done and over," and Detective Voelker responded, "Yeah, it[']s done and over with." Ex. 5, at 22-23. Maupin told Detective Voelker that he did not understand, but then immediately thereafter confessed. Maupin said he interpreted closing the case out to mean that "it would be done with and I would

_____

[4] Maupin was investigated in 2004 for allegations of sexual contact with his five-year-old female cousin. Sergeant Kimber Yund interviewed Maupin in the same interview room where Detective Voelker interviewed him in 2011. Maupin denied the allegations and was allowed to leave the police department. He was later charged and pled guilty to second degree attempted child molestation.

5

be able to leave. That if I said what he wanted me to say I could leave." 1B RP at 170. But Maupin stated that he also thought he was going to jail after his interview anyway because he had a warrant for his arrest on a prior DUI charge.

Even though Detective Voelker used the no penetration defense ruse and told Maupin he just wanted to close the case out, Detective Voelker testified that he never made any threats to get Maupin to speak with him, nor did he make any promises about what would or would not happen in the case. Detective Voelker explained that closing the case was his goal in every case, which required going forward with the interview and working to the conclusion of the case.

Maupin initially denied all allegations and explained that he possibly touched J.W. with a wipe while he changed J.W.'s diaper. Maupin then confessed to touching J.W. but shortly thereafter retracted his confession by stating he confessed only because it was what Detective Voelker wanted to hear. Toward the end of the 30-minute interview Maupin confessed by saying, "I did it," and then answering "yes" to three questions: (1) Did you touch J.W.'s butt?; (2) Did you touch J.W.'s penis?; and (3) Did you touch J.W.'s penis with your lips? Ex. 5, at 23. Thus, Maupin's confession consisted of his general statement, "I did it," and answering "yes" to three of Detective Voelker's six questions. Ex. 5, at 23. Maupin did not confess to any form of penetration. After Maupin confessed, Detective Voelker told Maupin he was under arrest for the warrant and for child molestation, to which Maupin replied, "I figured." 1B RP at 118.

III. PROCEDURAL HISTORY

The State charged Maupin with first degree child rape and first degree child molestation. Maupin was arraigned and trial was set for October 17, 2011. The trial date was continued to November 28, 2011 upon the State's motion. The State then filed a second motion for

6

continuance because there was not adequate time for the *Ryan* hearing before trial. The trial court found good cause for the continuance and set a new trial date for January 3, 2012.

On December 5, 16, and 21, 2011, the trial court conducted a *Ryan* hearing to determine the admissibility of J.W.'s child hearsay statements under RCW 9A.44.120, and a CrR 3.5 hearing[5] to determine the admissibility of Maupin's statements to Detective Voelker. After determining that J.W. was incompetent and thus unavailable to testify, the trial court heard testimony from West and J.C. regarding statements J.W. made to them about Maupin touching him. The trial court also heard testimony from Detective Voelker, Sergeant Kimber Yund, who interviewed Maupin regarding the 2004 sexual contact with a minor investigation, and Maupin.

The day before trial on January 2, 2012, the State learned of new statements J.W. made to West after the December 5, 2011 *Ryan* hearing. The trial court pushed the trial date to January 26, 2012, to allow time for a continuation of the *Ryan* hearing to determine the admissibility of J.W.'s new statements. Maupin objected to this continuance, but the trial court found good cause and determined Maupin would not be prejudiced. At the continued *Ryan* hearing, the trial court heard testimony from West and West's neighbor, to whom J.W. also allegedly made statements after the December 5, 2011 *Ryan* hearing.

Regarding the *Ryan* hearing, the trial court determined that J.W.'s alleged statements to West[6] and J.C. were reliable and were corroborated by additional evidence. The trial court found

---

[5] CrR 3.5(a) provides in relevant part, "When a statement of the accused is to be offered in evidence, the judge at the time of the omnibus hearing shall hold or set the time for a hearing, if not previously held, for the purpose of determining whether the statement is admissible."

[6] This included West's testimony regarding J.W.'s statement to her in May or June 2011 while she was changing his diaper, the statement J.W. made in July 2011 while West was babysitting, the statement J.W. made a couple weeks after his second CJAC forensic interview, and the statement J.W. made after the December 5, 2011 hearing.

7

J.W.'s alleged statements to West's neighbor unreliable and thus inadmissible. Regarding the CrR 3.5 hearing, the trial court found that Detective Voelker did not use any threats or coercion to obtain Maupin's statement, that Maupin's testimony was not credible, that Maupin was not convinced of the no penetration defense, that Detective Voelker's statement that he wanted to close the case out did not overbear Maupin's will and cause him to make an irrational choice, and that Maupin's choice to confess was rational. The trial court also stated the no penetration defense was "sufficiently vague and unclear that it didn't really mislead Mr. Maupin." 2 RP at 281. The trial court concluded that Maupin's statements to Detective Voelker were made knowingly, intelligently, and voluntarily and were admissible at trial.

Maupin waived his right to a jury trial and the trial court found him not guilty of first degree child rape, but guilty of first degree child molestation. The trial court sentenced Maupin to 119 months to life. Maupin timely appeals.

ANALYSIS

I.    STANDARD OF REVIEW

Our Supreme Court rejected the principle of an independent appellate review of the record in a confession case: "We hold that the rule to be applied in confession cases is that findings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record." *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). "Consequently, when reviewing a trial court's conclusion of voluntariness, an appellate court determines 'whether there is substantial evidence in the record from which the trial court could have found that the confession was voluntary by a preponderance of the evidence.'" *State v. Rafay*, 168 Wn. App. 734, 757-58, 285 P.3d 83 (2012) (quoting *Broadaway*, 133 Wn.2d at 129).

8

43191-2-II

II.  VOLUNTARY CONFESSION

Maupin argues the trial court improperly admitted his involuntary statements in violation of his right to due process and his right to remain silent under the Fifth and Fourteenth Amendments and the Washington State Constitution. Specifically, Maupin contends Detective Voelker misrepresented the law, made false promises of immunity, gave Maupin incorrect legal advice, lied about the facts of the case, and presented himself as a trustworthy friend; which he argues all together resulted in his involuntary statement that the trial court should have suppressed. Because Maupin made the rational and voluntary decision to confess and his will was not overborne by coercive police tactics, we affirm.

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Article I, section 9 of the Washington State Constitution states that "[n]o person shall be compelled in any criminal case to give evidence against himself." The protection provided by the state provision is coextensive with that provided by the Fifth Amendment. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008).

We examine the totality of the circumstances to determine if statements made during a custodial interrogation were coerced, meaning that the defendant's will was overborne by the circumstances surrounding the giving of the confession. *Unga*, 165 Wn.2d at 100; *Broadaway*, 133 Wn.2d at 132. Circumstances relevant to the totality of the circumstances analysis include the location, length, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of his Fifth Amendment rights. *Unga*, 165 Wn.2d at 101. So long as the defendant's decision to confess was a "'product of [his] own balancing of competing considerations, the confession is

9

voluntary.'" *Unga*, 165 Wn.2d at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)).

The totality of the circumstances test specifically applies to determine whether a confession was coerced by any express or implied promise or by the exertion of any improper influence. *Unga*, 165 Wn.2d at 101. Police lies, promises, or misrepresentations during an investigation do not automatically render any resulting statements inadmissible. *Unga*, 165 Wn.2d at 101; *Broadaway*, 133 Wn.2d at 132. But if the police tactics manipulated or prevented a defendant from making a rational, independent decision about giving a statement, the statement is inadmissible. *Unga*, 165 Wn.2d at 102 (quoting *Miller*, 796 F.2d at 605); *Broadaway*, 133 Wn.2d at 132. Thus, the misstatement or promise must be sufficiently compelling to overbear the suspect's will in light of all the attendant circumstances.

A detective's misstatement or misrepresentation of the law also does not automatically result in a subsequent confession being involuntary. *See, e.g., Conner v. McBride*, 375 F.3d 643, 654 (7th Cir. 2004) (trial court was not unreasonable in determining defendant's confession was voluntary, even though police officer's may have misrepresented state criminal law after the defendant's voluntary *Miranda* waiver); *Jackson v. Frank*, 348 F.3d 658, 663, 665 (7th Cir. 2003) (citing *Soffar v. Cockrell*, 300 F.3d 588, 591 (5th Cir. 2002)) (state trial court was not unreasonable in concluding that defendant's *Miranda* waiver was voluntary despite the detective's misstatement of state law regarding the availability of a public defender for the defendant while he was being questioned); *State v. Curtiss*, 161 Wn. App. 673, 690, 250 P.3d 496 (2011) (defendant's statements were not involuntary when detective correctly told defendant that the statute of limitations for rendering criminal assistance expired and then defendant's statements were used to charge and convict her with first degree murder). Our Supreme Court

10

has stated that "[w]hile we do not condone deception, that alone does not make a confession inadmissible as a matter of law." *State v. Braun*, 82 Wn.2d 157, 161, 509 P.2d 742 (1973).

Instead, to be involuntary, the detective's deception must overbear the defendant's "will to resist and bring about confessions not freely self-determined." *Braun*, 82 Wn.2d at 162 (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961)). "'The question [is] whether [the interrogating officer's] statements were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess.'" *Unga*, 165 Wn.2d at 102 (quoting *Miller*, 796 F.2d at 605) (alterations in original). In *Curtiss*, we held that a police officer's accurate statement to Renee Curtiss that the statute of limitations had run for rendering criminal assistance did not "override Curtiss's independent decision-making process or coerce her into giving a statement," which resulted in her being convicted of first degree murder. 161 Wn. App. at 690. We held Curtiss's failure to realize all the possible consequences of giving the statement did not change its voluntary nature. *Curtiss*, 161 Wn. App. at 691 (citing *State v. Heggins*, 55 Wn. App. 591, 598-99, 779 P.2d 285 (1989) (stating that the United States Supreme Court has "never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness" when assessing the voluntariness of custodial statements) (internal quotation marks omitted) (quoting *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987))).

Additionally, "[a] police officer's psychological ploys, such as playing on the suspect's sympathies, saying that honesty is the best policy for a person hoping for leniency, or telling the suspect that he could help himself by cooperating may play a part in a suspect's decision to confess." *Unga*, 165 Wn.2d at 102; *see also Miller*, 796 F.2d at 605 ("[I]t is generally recognized that the police may use some psychological tactics in eliciting a statement from a

11

suspect."). So long as the statements are a product of the defendant's own balancing of competing considerations, the statements are voluntary. *Unga*, 165 Wn.2d at 102 (quoting *Miller*, 796 F.2d at 605). The question we must answer, then, is not whether Detective Voelker's statements were the cause of Maupin's confession—indeed, we assume that to be the case—but whether those statements were so manipulative or coercive that they deprived Maupin of his ability to make an unconstrained, autonomous decision to confess.

Here, Detective Voelker stated early in the interview that he could either be Maupin's friend or his enemy, and Detective Voelker reiterated throughout the interview that he could be Maupin's friend and that Maupin could trust him. Detective Voelker told Maupin that he had conclusive evidence from the CJAC forensic interview with J.W. that Maupin had touched J.W. and that Maupin had put his lips on J.W.

Detective Voelker also told Maupin the law "changed a little bit" since his 2004 conviction and now "no penetration" is a defense to sexual contact with a minor. Ex. 5, at 3. Detective Voelker showed Maupin a copy of the relevant statute, which he had altered, to reinforce the no penetration defense, and then read a portion of the altered statute to Maupin: "[I]t is a defense that only exterior touching occurred of, body parts, without penetration however so slight." Ex. 5 (Altered Copy of RCW 9A.44.030). Detective Voelker also told Maupin he just wanted to close the case out. Throughout Maupin's 30-minute interview, Detective Voelker reiterated the no penetration defense and that he wanted to close the case out multiple times.

Maupin twice questioned the no penetration defense and stated, "[I]t's so ridiculous." Ex. 5, at 15. Maupin stated that he never actually read the document with the altered statute, nor did he really look at it. Maupin also twice asked Detective Voelker what closing the case out

12

meant. The first time Maupin asked, "That would like what end this—end it all?" and Detective Voelker responded, "Pretty much . . . but I need it to be the truth." Ex. 5, at 15. The second time Maupin asked, "So if you just close the case, what does that mean? It's done and over," and Detective Voelker responded "Yeah, it[']s done and over with." Ex. 5, at 22-23. Maupin then stated he did not understand and immediately thereafter confessed. When asked what he thought closing the case meant at the CrR 3.5 hearing, Maupin said he interpreted it to mean if he told Detective Voelker what he wanted to hear, then Maupin could leave. Maupin also stated he believed he was going to jail after his interview with Detective Voelker anyway because he had a warrant for his arrest.

The trial court found that Detective Voelker did not use any threats or coercion to obtain Maupin's statement, that Maupin's testimony was not credible, that Maupin was not convinced of the no penetration defense, that Detective Voelker's statement that he wanted to close the case out did not overbear Maupin's will and cause him to make an irrational choice, and that Maupin's choice to confess was rational. The trial court also stated the no penetration defense was "sufficiently vague and unclear that it didn't really mislead Mr. Maupin." 2 RP at 281. We agree.

Maupin was given *Miranda* warnings and knew his rights. He acknowledged and waived these rights. There is no evidence that he lacked the capacity to understand his rights or the consequences of waiving his rights. He was 22 years old. The questioning was of short duration, lasting only 30 minutes. Maupin was questioned in a small room containing a table and two chairs, where the door was left unlocked. The interviewing officer was not in uniform. There is no evidence that Detective Voelker used a threatening tone, raised his voice, badgered Maupin, attempted to intimidate him, or engaged in other similar tactics. Maupin was not

13

subjected to lengthy, prolonged questioning, nor with repeated rounds of questioning. There is no evidence that he was deprived of any necessities such as food, sleep, or bathroom facilities. In *United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004), the Court found the defendant's confession was voluntary, noting among other things that it placed "substantial weight on the fact that [the defendant] confessed after a mere thirty-three minutes" and the situation was not one where officers wore down the defendant's will with persistent questioning over a considerable length of time.

Maupin also had prior experience with police interviews. In his 2004 interview with Detective Yund in the same interview room, Maupin denied the allegations of sexual contact with a child and left the police station. Maupin was later arrested and charged with a sex offense, to which he pleaded guilty. He acknowledged at the CrR 3.5 hearing that merely walking out of the police station did not mean that the investigation was over. Thus, Maupin did not reasonably rely on Detective Voelker's statements regarding the no penetration defense and closing the case because Maupin understood that confessing and leaving an interview room did not end the investigation or close the case.

Although Maupin certainly felt pressure to confess, there is sufficient evidence that his statements were voluntary and the product of his own rational choice. As discussed above, even if an officer's psychological ploys played a part in a defendant's decision to confess, as long as the decision is "'a product of the suspect's own balancing of competing considerations,'" the confession is voluntary. *Unga*, 165 Wn.2d at 102 (quoting *Miller*, 796 F.2d at 605). Any promise by the police must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances. *Unga*, 165 Wn.2d at 108 (quoting *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (1988)). Maupin's potential failure to realize the possible consequences of

14

giving his statements does not change its voluntary nature. *See Curtiss*, 161 Wn. App. at 691. Because the interview was of a short duration, Maupin was 22 years old and had experience with a sexual conduct with a child investigation, and Maupin does not appear to have believed or have reasonably relied on Detective Voelker's no penetration defense, the trial court did not err when it concluded that Maupin's statements were voluntary and admissible. Thus, Detective Voelker's no penetration defense and statements regarding closing out the case did not overbear Maupin's will and cause him to make an irrational choice. Under the totality of the circumstances Maupin's confession was voluntary. Accordingly, we affirm the trial court.

III.    SAG ARGUMENTS

A.    CrR 3.3 TIME FOR TRIAL

Maupin maintains the trial court misread CrR 3.3, which resulted in a violation of his time for trial right. Although CrR 3.3(b)(1)(i) requires trial within 60 days when the defendant is in custody, this requirement "'is not a constitutional mandate.'" *State v. Carson*, 128 Wn.2d 805, 821, 912 P.2d 1016 (1996) (quoting *State v. Terrovona*, 105 Wn.2d 632, 651, 716 P.2d 295 (1986)). Under CrR 3.3(h), the trial court must dismiss charges when the applicable time for trial period has expired without a trial, but CrR 3.3(e) excludes the time allowed based on valid continuances and other delays from the time for trial period.

When any period of time is excluded from the time for trial period under CrR 3.3(e), the time for trial period extends to at least "30 days after the end of that excluded period." CrR 3.3(b)(5). Excluded periods under CrR 3.3(e) include delays "granted by the court pursuant to section (f)." CrR 3.3(e)(3). A court may grant a continuance based on "written agreement of the parties, which must be signed by the defendant" or "[o]n motion of the court or a party" where a continuance "is required in the administration of justice and the defendant will not be prejudiced

15

in the presentation of his or her defense." CrR 3.3(f)(1), (2). Furthermore, moving for a continuance "by or on behalf of any party waives that party's objection to the requested delay." CrR 3.3(f)(2).

Here, Maupin was arraigned on August 24, 2011, and the first trial setting was for October 17, 2011. After Maupin made a discovery motion, the State moved for a continuance, to which Maupin's counsel, but not Maupin, agreed. The trial court found good cause to continue the matter and set a new trial date of November 28, 2011. The State filed a second motion to continue on November 18, 2011 because it would not have time to do the *Ryan* hearing before trial, to which Maupin objected. The trial court again found good cause to continue and set a new trial date of January 3, 2012. Due to the State receiving new evidence the day before trial on January 2, 2012, the trial date was pushed back to January 26, 2012, so that the trial court could hold a continuation of the *Ryan* hearing to determine the admissibility of the new evidence. Maupin objected to this continuation, but the trial court found good cause and determined Maupin would not be prejudiced.

Because the trial court found good cause to continue the trial to January 3, 2012, under CrR 3.3(f)(2), the time from November 28, 2011, through January 3, 2012, was considered an excluded period under CrR 3.3(e) and the time for trial period extended 30 days after the new trial date of January 3, 2012 to February 2, 2012. The trial court held Maupin's trial on January 26-27, 2012, and the trial court gave its verdict on January 30, 2012. Thus, the trial court did not violate Maupin's time for trial right under CrR 3.3.

B.     RELIABILITY OF TESTIMONY AT RYAN HEARING

Maupin argues the trial court improperly admitted J.W.'s hearsay statements from J.C.'s

and West's testimony in the *Ryan* hearing. Maupin maintains their testimony was inconsistent

and thus unreliable.

We review a trial court's admission of child hearsay statements to determine if its

decision is manifestly unreasonable or based on untenable reasons or grounds. *State v. Borboa*,

157 Wn.2d 108, 121, 135 P.3d 469 (2006). After finding J.W. incompetent to testify, the trial

court assessed the reliability of J.W.'s statements to J.C. and West using the nine elements

required by *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984), and found the statements

reliable. Because the trial court properly weighed the elements of reliability of the witnesses'

testimony as required by *Ryan*, we do not disturb its decision on appeal.

C.     RYAN HEARING

Maupin argues the trial court improperly treated the *Ryan* hearing on January, 17, 2012,

as a continuation of the *Ryan* hearing held on December 5, 16, and 21, 2011. Specifically,

because J.W. only testified in December 2011, Maupin contends the trial court cannot take its

"best guess of what the child['s] development has been," and instead the trial court was required

to re-determine J.W.'s competency to testify in January 2012. SAG at 4.

We review a trial court's decision to admit child hearsay statements to determine if its

decision was manifestly unreasonable or based on untenable grounds or reasons. *State v. Woods*,

154 Wn.2d 613, 623, 114 P.3d 1176 (2005); *State v. Kennealy*, 151 Wn. App. 861, 879, 214 P.3d

200 (2009). Child hearsay statements are admissible under RCW 9A.44.120, which provides:

> A statement made by a child when under the age of ten describing any act of
> sexual contact performed with or on the child by another, describing any
> attempted act of sexual contact with or on the child by another . . . is admissible in

17

evidence in . . . criminal proceedings . . . in the courts of the state of Washington if:

(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings; or

(b) Is unavailable as a witness: PROVIDED, That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

The State must make an effort to produce the child for the court to make a decision on the child's availability. *Ryan*, 103 Wn.2d at 172. A child may be unavailable because he is incompetent to testify. *Ryan*, 103 Wn.2d at 172. Competency is a matter to be determined by the trial court within the framework of RCW 5.60.050.[7] *Ryan*, 103 Wn.2d at 172. Guidelines for the trial court in reaching its determination presume that the court has examined the child, and observed his manner, intelligence, and memory. *Ryan*, 103 Wn.2d at 172.

Here, the trial court made a determination of J.W.'s incompetency on the first day of the *Ryan* hearing on December 5, 2011. After new evidence came to light on January 2, 2012, the trial court held a continuation of the *Ryan* hearing on January 17, 2012. The trial court did not re-evaluate J.W. at the continuation hearing on January 17, 2012, and instead stated that its initial examination of J.W. was sufficient and that J.W. was unavailable:

> I talked about developmental issues. Obviously, I'm not an expert on developmental issues of children. I do recall, though, when I watched [J.W.] on his testimony from December 5th, he's a very young child. He's a very young child. And even if he made tremendous gains, to say that there's a pink elephant

---

[7] RCW 5.60.050(2) provides in relevant part that persons "who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly" are not competent to testify.

18

43191-2-II

in the room, or to say that his house is pink, it's just—I'm not going to revisit that. I think, you know, six weeks, five weeks from the time that I determined that he was unavailable or incompetent and therefore unavailable, I think that ruling still holds today. And so, I'll make that finding that he's unavailable.

3 RP at 423-24.

Nothing in RCW 9A.44.120 requires that the trial court make a determination of the child's unavailability at a second *Ryan* hearing for the same trial, let alone a continuation of a *Ryan* hearing. Instead, the statute requires only that the trial court make a finding that the child is unavailable for the child hearsay statements to be admissible. *See* RCW 9A.44.120. The trial court here examined J.W., observed his manner, intelligence, and memory on December 5, 2011 and found him to be unavailable. Accordingly, the trial court's decision to treat the January 2012 *Ryan* hearing as a continuation and to find its December 5, 2011 determination of J.W.'s unavailability sufficient was not manifestly unreasonable.

We affirm Maupin's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Penoyar, J.

We concur:

_____
Hunt, J.

_____
Worswick, C.J.

19